**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re

CUSTOMS AND TAX ADMINISTRATION
OF THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

This document relates to case nos.:
18-cv-07828; 19-cv-01785; 19-cv-01867; 19-cv-
01893; 19-cv-01781; 19-cv-01783; 19-cv-01866;
19-cv-01895; 19-cv-01794; 19-cv-01865; 19-cv-
01904; 19-cv-01798; 19-cv-01869; 19-cv-01922;
19-cv-01800; 19-cv-01788; 19-cv-01870; 18-cv-
07827; 19-cv-01791; 19-cv-01792; 19-cv-01928;
19-cv-01926; 19-cv-01868; 18-cv-07824; 19-cv-
01929; 19-cv-01803; 19-cv-01806; 19-cv-01906;
19-cv-01801; 19-cv-01894; 19-cv-01808; 19-cv-
01810; 19-cv-01809; 18-cv-04833; 19-cv-01911;
19-cv-01898; 19-cv-01812; 19-cv-01896; 19-cv-
01871; 19-cv-01813; 19-cv-01930; 18-cv-07829;
18-cv-04434; 19-cv-01815; 19-cv-01818; 19-cv-
01931; 19-cv-01918; 19-cv-01873; 19-cv-01924;
19-cv-10713; 21-cv-05339.

MASTER DOCKET

18-md-2865 (LAK)

---

**PLAINTIFF SKATTEFORVALTNINGEN'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE CERTAIN EVIDENCE**
**DEFENDANTS CLAIM SUPPORTS THEIR COMPARATIVE FAULT OR STATUTE**
**OF LIMITATIONS DEFENSES**

HUGHES HUBBARD & REED LLP
William R. Maguire
Marc A. Weinstein
Neil J. Oxford
Dustin P. Smith
Gregory C. Farrell
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Counsel for Plaintiff Skatteforvaltningen*
*(Customs and Tax Administration of the*
*Kingdom of Denmark)*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ............................................................................................................4

LEGAL STANDARD....................................................................................................11

ARGUMENT..............................................................................................................12

CONCLUSION............................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arlio v. Lively*, 474 F.3d 46 (2d Cir. 2007)........................................................12, 20, 21

*Casmento v. Volmar Constr., Inc.*, No. 20-CV-0944 (LJL), 2022 WL 1094529
 (S.D.N.Y. Apr. 12, 2022)..................................................................................20

*Columbia Mem'l Hosp. v. Hinds,* 192 N.E.3d 1128 (N.Y. 2022)................................14

*In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund
 Litig.*, No. 18-md-2865 (LAK), 2023 WL 8039623 (S.D.N.Y. Nov. 20, 2023)...............13, 14

*Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173 (S.D.N.Y. 2008)..................11, 12

*Kwiatkowski v. Bear, Stearns & Co.*, No. 96 Civ. 4798(VM), 2000 WL 640625
 (S.D.N.Y. May 18, 2000).................................................................................14

*LNC Invs., Inc. v. First Fid. Bank*, No. 92 Civ. 7584 CSH, 2000 WL 1072460
 (S.D.N.Y. Aug. 3, 2000)..................................................................................12

*McClain v. Pfizer Inc.*, No. 3:06-CV-01795-VLB, 2010 WL 746777 (D. Conn.
 Mar. 1, 2010)..............................................................................................21

*McLeod v. Llano*, No. 17-CV-6062 (ARR) (RLM), 2021 WL 1669732 (E.D.N.Y.
 Apr. 28, 2021)............................................................................................20

*Ordonez v. A& S Broadway Produce Inc.*, No. 14-cv-4152 (NSR)(JCM), 2015
 WL 5729415 (S.D.N.Y. Sept. 29, 2015)................................................................12

*Palmieri v. Defaria*, 88 F.3d 136 (2d Cir. 1996) ........................................................12

*Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60 (2d Cir. 1998) ..............................19

*Paramount Film Distrib. Corp. v. State of New York,* 285 N.E.2d 695 (N.Y. 1972) ..................15

*In re September 11 Litig.*, 621 F.Supp.2d 131 (S.D.N.Y. 2009) ..................................21

*Stoncor Grp., Inc. v. Peerless Ins. Co.*, 573 F. Supp. 3d 913 (S.D.N.Y. 2021)..........................12

*Sulton v. Lahood*, No. 08 Civ. 2435(PKC), 2009 WL 3815764 (S.D.N.Y. Nov. 6,
 2009) .......................................................................................................19

*United States v. Murgio*, No. 15-CR-769 (AJN), 2017 WL 365496 (S.D.N.Y. Jan.
 20, 2017) ...................................................................................................18

**Statutes and Rules**

Federal Rule of Evidence 401 ..........................................................................12

Federal Rules of Evidence 403 ..................................................................................................12

Plaintiff Skatteforvaltningen ("SKAT") respectfully submits this memorandum of law in support of its motion *in limine* to exclude under Federal Rules of Evidence 402 and 403 irrelevant and unfairly prejudicial evidence concerning SKAT's administration of dividend withholding tax that defendants claim supports their comparative fault or statute of limitations defenses.

## PRELIMINARY STATEMENT

SKAT alleges and intends to prove at trial that defendants defrauded Denmark out of hundreds of millions of dollars in refunds of tax supposedly withheld from dividends Danish companies paid to their shareholders. From late 2012 through mid-2015, defendants submitted to SKAT fraudulent tax refund claims enclosing dividend credit advices issued by their purported custodians evidencing ownership of Danish shares and receipt of dividends, net of withholding tax, which SKAT paid based on that supposed third-party documentation and defendants' representations. Unbeknownst to SKAT, however, the custodians were in on the fraud and the tax refund claims and dividend credit advices were completely false. The defendants never owned any Danish shares or received any Danish dividends, and certainly never paid any tax. The custodians issued the dividend credit advices based on pre-arranged, fictitious circular trades in which the defendants pretended to buy shares from sellers that had no shares and that pretended to borrow the shares from the defendants, who had no shares in the first place.

Nevertheless, defendants maintain that not only were their refund claims not fraudulent, in that they had no intent to deceive SKAT, but that they were—and are today—entitled to the refunds under Danish tax law. And in the same breath, defendants argue that if it turns out they are wrong about that, then SKAT should have known from the start that their refund claims were false, such that the Danish three-year limitations period began to run on SKAT's claims from the

moment it paid them.  In addition to being premised on a misinterpretation of Danish law,

however, that argument not only defies common sense but relies on evidence of SKAT's

awareness of irrelevant issues with respect to its administration of dividend withholding tax that

have nothing to do with how SKAT alleges defendants perpetrated their fraud.  For instance,

whether SKAT was aware that where actual securities are loaned around the dividend dates,

multiple parties may believe they can claim refunds based on the same dividend says nothing

about when SKAT should have known that defendants' refund claims were fraudulent.  Nor is it

relevant if SKAT was aware that it could not determine the ultimate owner of shares held in

omnibus accounts at the Danish central securities depository VP Securities.  That feature of the

securities industry, over which SKAT had no control, has no bearing on whether or when SKAT

should have known that the dividend credit advices that defendants submitted to SKAT,

supposedly evidencing that they were the owners of shares and dividends, were fraudulent.  Nor

are such matters relevant to defendants' arguments: that SKAT was comparatively negligent in

paying their claims; that SKAT's reliance on the representations in their refund claims was

unreasonable; or that SKAT's payments were not a mistake.

Thus, the Court should exclude from trial the evidence on which defendants intend to rely

for these irrelevant matters.  For instance, the 2007 memorandum that SKAT's then-chief legal

officer wrote on stock loan issues has no relevance to defendants' fraudulent refund claims.

SKAT does not claim that defendants' refund claims were fraudulent because they loaned or

borrowed shares or because multiple parties made refund claims based on the same dividends.

The refund claims were fraudulent because there never were any shares or dividends.

Similarly irrelevant are former SKAT employee Lisbeth Rømer's memoranda and other

papers noting that where foreign shareholders held shares in an omnibus account at VP

Securities, reports available to SKAT identified only the bank that held the omnibus account at VP Securities, not the end investor. This evidence is irrelevant because SKAT did not pay the defendants' fraudulent refund claims based on any reports of omnibus accounts at VP Securities. SKAT paid the defendants' refund claims based on the false evidence defendants provided of share ownership and dividend receipt.

Nor do the Ministry of Taxation's internal audit agency ("SIR")'s reports from before and during the fraud have any bearing on when SKAT should have known of the fraud or whether SKAT was negligent in paying the refund claims at issue. The issues identified in those reports concerned mainly the timing of reports SKAT received concerning Danish companies' dividend declarations and the recipients of those dividends, and the separate so-called "bank" or "spreadsheet scheme," whereby SKAT relied on Danish banks to collect the information showing their customers' entitlement to a refund and permitted the banks to apply for the refund on their customers' behalf. Defendants did not use the "bank scheme" to submit their refund claims. Nor could they have because no Danish bank ever held any shares on their behalf. Rather, defendants submitted their refund claims using SKAT's "form scheme," which required defendants to provide the evidence of their entitlement to a refund directly to SKAT.

The parts of SIR's September 2015 and the Danish National Audit Office's 2016 reports from after the fraud was discovered concerning the same issues previously identified by SIR and Ms. Rømer are irrelevant for the same reasons. None of those issues bears on whether SKAT should have known of defendants' fraud earlier than it did or whether SKAT was negligent in paying the defendants' refund claims. And the conclusions in those reports concerning SKAT's overall administration of dividend withholding tax and the Ministry of Taxation's supervision of SKAT are, in any event, unfairly prejudicial even if they did have some relevance. Showing the

jury those portions of the reports would risk the jury simply deferring to SIR's and the National Audit Office's conclusions, and the trial devolving into a set of satellite trials on the basis for the conclusions in those reports.

## **BACKGROUND**

### **Leif Normann Jeppesen's 2007 memorandum on stock lending.**

In 2007, Leif Normann Jeppesen, SKAT's then-chief internal legal officer, identified "a major control problem" arising from stock lending. (Declaration of Marc A. Weinstein, dated August 15, 2024 ("Weinstein Decl.") Ex. 1 at 4.) Mr. Jeppesen recounted that the Danish "National Tax Court ha[d] ruled that only the owner can be taxed on dividends, and since the lender is not considered to have disposed of the shares for tax purposes, it is he . . . who should be taxed for dividends." (*Id.*) Yet "the borrower has the shares in question (listed as the owner in VP) and therefore immediately also registers as the dividend recipient and receives the dividend as such," and "[t]he problem is even greater if the borrower has resold the shares to a buyer—and this buyer may again have lent the shares to a borrower who has in turn resold the shares." (*Id.*)

Thus, Mr. Jeppesen concluded, "the current tax rules in Denmark . . . mean[] that the same shareholding can legally be . . . included in the holding of several owners—but only the actual (original) owner can receive dividends from it in a tax sense." (*Id.*) And he recommended that SKAT's "dividend declaration forms should be carefully reviewed to make it clear what our requirements are for ownership . . . and proof of this in order to obtain a refund of dividend tax." (*Id.* at 5)[1] The issues in these cases have nothing to do with which one of multiple parties to a

---

1. The impetus for Mr. Jeppesen's 2007 memorandum was a 2006 refund claim by a French entity claiming ownership of more than 50 percent of the dividends issued by a Danish company from which tax was withheld. (*Id.* at 4.) SKAT suspected that the refund claim may have been a tax avoidance scheme, but in the end, paid the refund after the claimant and its custodian submitted additional information to SKAT.

lending agreement or a sale of borrowed shares is liable to be taxed (and to reclaim that tax) on dividends issued on those shares, or whether SKAT received multiple refund claims for the same shares from each of the two counterparties to a stock lending transaction.  As noted above, SKAT does not claim that defendants obtained Danish shares by way of a stock loan (and nor do defendants claim that they obtained Danish shares by way of a stock loan), or that multiple parties submitted claims for refunds based on the same shares of stock.  SKAT claims that defendants never obtained any shares, by any form of loan or otherwise, and that no party in any of the circular loop trades ever had any shares or received any dividends.

**Ms. Rømer's Problem Catalog and other memoranda.**

Lisbeth Rømer is a former SKAT employee who worked in the "Accounting 2" division that administered dividend withholding tax until her retirement in 2013.  (Weinstein Decl. Ex. 2 (Rømer Dep. Tr.) 30:11-14; 32: 3-10.)  During her time at SKAT, Ms. Rømer identified several challenges in SKAT's administration of dividend withholding tax, most of which were summed up in a 2006 memorandum written by Ms. Rømer and certain of her colleagues called the "Problemkatalog," or in English, "Problem Catalog," and most of which were resolved before defendants commenced their fraud.

For instance, the main challenge that Ms. Rømer identified concerned the different deadlines for Danish companies to report to SKAT their dividend declarations and the amount of tax withheld compared with the timing of reports of the dividend recipients that held accounts at VP Securities.  Before a legislative change, which took effect for publicly traded Danish companies in 2013, companies distributing dividends reported to SKAT the total amount of the dividend and tax withheld the following month, but information concerning the "dividend

5

recipients" was not reported to SKAT until January of the next year. (Weinstein Decl. Ex. 3 at 5; Weinstein Decl. Ex. 2 (Rømer Dep. Tr.) 72:2-22; 235:1-12.)[2]

The only issue identified in the Problem Catalog that was not resolved (and remains unresolved today) is that where shares are held in "nominee" or omnibus accounts, the "mandatory reports" of dividend recipients SKAT receives "do not extend beyond the person who has made the transaction or set up the depository 'nominee'" account, *i.e.*, the report includes only the financial institution that held the omnibus account, not the banks and other customers that held shares custodied in the omnibus account or their respective customers, and, most significantly, not the end investor who ultimately owned the shares. (Weinstein Decl. Ex. 3 at 19.) The legislative change implemented in 2013 for publicly listed companies did not, and could not, address this issue because even the reporting companies do not know the ultimate owners of shares held in omnibus accounts and therefore cannot provide SKAT with such information, regardless of when it was submitted.

To address this issue, Ms. Rømer and her colleagues recommended that "stricter documentation requirements should be established for the shareholding in the event of reimbursement/refund of Danish dividend tax (if a nominee has been registered, including joint custodian accounts), so that the dividend tax administration can be sure of the ownership of the actual distribution." (*Id.* at 20.) And Ms. Rømer supported an initiative by the OECD/European Union to introduce a new TRACE system for relief at source payment of dividend withholding

---

2. Ms. Rømer characterized this as making refund payments "blindly" based on this difference in reporting deadlines, which she testified was "the most important issue within the Danish administration of the companies for the Danish taxation purposes," that she wanted to change. (Weinstein Decl. Ex. 2 (Rømer Dep. Tr.) 152:11-154:5)

tax refunds that never came to fruition and that would have obviated the issue.  (Weinstein Decl. Ex. 2 (Rømer Dep. Tr.) 172:10-17; 206:23-208:4; 240:15-243:5.)[3]

**SIR's audit reports from before the fraud was discovered.**

SIR is the agency within the Ministry of Taxation that conducts audits on behalf of the Danish National Audit Office of the Ministry and its ministerial authorities, including SKAT. (Weinstein Decl. Ex. 4 (Brøchner Dep. Tr.) 35:4-18.)  Before June 2015, when SKAT received a tip that there may be fraud, SIR conducted four audits concerning SKAT's administration of dividend tax and issued reports on January 20, 2006, May 10, 2010, May 30, 2013, and June 27, 2014, respectively.

The January 2006 report concluded that SKAT's "case handling process in the area" of dividend withholding tax refunds was "generally satisfactory," noting only two issues both of which were subsequently resolved.  (Weinstein Decl. Ex. 5 (2006 Report) at 3.)  First, SIR found "[t]hat dividend tax control ha[d] not been satisfactorily performed as a result of the lack of satisfactory system support," but that this issue was "expected to be" resolved "with the decision to introduce [the] 3S" system in "January 2006."  (*Id.* at 3; Weinstein Decl. Ex. 2 (Rømer Dep. Tr.) 230:22-231:19.)  And second, SIR did "not find it satisfactory that in certain situations, it is possible for dividend recipients to receive dividend tax, even if the company paying the dividend has not paid the withheld tax to SKAT," (Weinstein Decl. Ex. 5 at 4), meaning that the timing of the refund payment at times pre-dated the issuing company's actual payment of withholding tax

---

3. Ms. Rømer identified several other issues with respect to SKAT's administration of dividend withholding tax that were subsequently resolved.  For instance, Ms. Rømer recommended that SKAT use a particular software called 3S specifically designed for processing dividend withholding tax refund claims, which recommendation was adopted in 2006.  (Weinstein Decl. Ex. 2 (Rømer Dep. Tr.) 230:22-231:19.)  Ms. Rømer also pointed out that because of the then 30-day deadline to process refund claims before interest began to accrue, in some instances, refund payments could be made before the dividend tax was collected.  (*Id.* at 105:21-106:4.)  This issue was fixed by 2012 legislation extending SKAT's time to process a refund claim to six months before interest accrued.  (*Id.* at 237:6-238:7.)

7

to SKAT.  But this issue was resolved by the 2012 legislation extending SKAT's time to process refund claims before interest accrues to six months.  (Weinstein Decl. Ex. 2 (Rømer Dep. Tr.) 235:1-237:5.)

The 2010 audit was made at the request of the Ministry of Taxation because "in an attempt to calculate the proceeds from the withholding tax on foreign shareholders' dividends," it had "encountered the problem that it is possible that too much withholding tax is refunded via the so-called refund scheme."  (Weinstein Decl. Ex. 6 (2010 Report) at 1.)  Ultimately, SIR concluded in this respect "that an approximate correct net proceeds from the refund scheme can only be calculated with great uncertainty from the information available in SKAT's dividend and refund system."  (*Id.* at 11.)  SIR also noted in its report that SKAT did "not carry out checks on whether the investor in question is actually a shareholder in the company in question," aside from requiring "a copy of the dividend note" to be submitted with the refund claim.  (*Id.* at 7-8.) And that it was the "opinion" of SKAT's Accounting 2 department that "[t]he use of omnibus accounts means that multiple dividend notes (swift messages) are printed for each share," making "it difficult to check whether dividend tax is recovered more than once per year per share."  (*Id.* at 8.)  Further, SIR noted that "omnibus accounts and nominee accounts . . . mean that the real owner of the shares [is] not known, so refunds are paid without proof of ownership and actual distribution."  (*Id.*)

With respect to SKAT's form scheme defendants used to submit their refund claims, SIR's 2013 report concluded that the "requests . . . are assessed before the refund amount is paid" and "[i]f documentation was insufficient, further material was requested, and the requests were rejected in the event of non-compliance."  (Weinstein Decl. Ex. 7 (2013 Report) at 6.)  But with respect to the separate "spreadsheet scheme," which defendants did not use to submit their

refund requests, SIR found that "SKAT's control" "is not sufficient" because "the basis" for the refund "is rarely assessed." (*Id.*) Further, SIR noted that in the form scheme, if there is a request for "a refund twice for the same share, the system is set up to give notice the second time." (*Id.*) But "as refunds via the spreadsheet scheme are entered as summary items, a dividend recipient will be able to request a refund more than once for the same share, either via both the form and spreadsheet scheme or multiple times via the spreadsheet scheme." (*Id.*)

SIR's 2014 report "contain[ed]" its "assessment of SKAT's treatment of . . . previous recommendations and . . . errors identified by the SIR in relation to the presentation of [its] account[s]." (Weinstein Decl. Ex. 8 (2014 Report) at 1.)

**SIR's September 2015 report.**

In September 2015, shortly after SKAT was alerted to potential fraud, SIR issued a report on "all current challenges in relation to SKAT's administration of dividend tax[,] the extent to which the recommendations from previous audit reports have been sufficiently followed up on," and "suggestions as to how the future administration of dividend tax is to be planned." (Weinstein Decl. Ex. 9 (2015 Report) at 5.) The purpose of the report was to "support[] the Minister for Taxation to assess SKAT's administration of dividend [tax] and the dividend procedure in order to inform the Danish Fiscal Affairs Committee." (*Id.* at 6.)

The report concluded "that a number of interdependent issues at SKAT have meant that it is possible to commit fraud directed at SKAT's administration of dividend tax," including "internal controls, the data structure and the determination of the overall responsibility." (*Id.* at 8.) In particular, the report concluded that SKAT "assess[ed]" "whether the requests for a refund received have been accompanied by the required documentation" and "recalculat[ed]" "the refund amount to verify" it, but that because "[a] large part of the Danish shares held by

individuals with limited Danish tax liability has . . . been deposited in omnibus accounts," "it will be difficult" for SKAT "to carry out an effective control based on the registered data," and that SKAT's controls were "generally weak."  (*Id.* at 8-9, 36-39.)

Further, the report "includes," among other things, "various calculations regarding dividend tax and refunds" "to describe the development and the scope of revenue and refunds" and "assess[]" "whether the full extent of the fraud has been uncovered;" (*id.* Section 7), a "[g]eneral assessment of SKAT's level of control in the section 38 [SKAT's accounting department] area," (*id.* Section 8), a description of "[t]he general procedure applying to dividend tax and refunds," (*id.* Section 9), a description "of the Ministry of Taxation's initiatives to strengthen processes and controls" (*id.* Section 17); and "[p]roposal[s] for future administration" (*id.* Section 20).

**The National Audit Office's 2016 report.**

In February 2016, the Danish National Audit Office issued a report to the Danish Public Accounts Committee concerning "SKAT administration of and the Ministry of Taxation's supervision of reimbursement of dividend tax."  (Weinstein Decl. Ex. 10 (2016 Report) at 2.) "The objective" of the report was "to assess whether SKAT's administration of the reimbursement of dividend tax and the Ministry of Taxation's supervision . . . have been satisfactory."  (*Id.* at 2-3.)

The National Audit Office concluded "that SKAT's administration of and the Ministry of Taxation's supervision of the reimbursement of dividend tax have been very unacceptable" and "extremely inadequate."  (*Id.* at 3.)  In the National Audit Office's view, "[b]oth SKAT and the Ministry of Taxation knew at least since 2010 that there were problems with the reimbursement of dividend tax," yet "attention was only drawn to the assumed fraud . . . because SKAT received

information from the public." (*Id.* at 4.)  In the National Audit Office's opinion, SKAT's

"reimbursement" of tax refund claims "was made on a completely inadequate basis and SKAT

did not check completely basic information in the requests, for example the ownership of the

shares and whether the applicant's dividend tax had been withheld." (*Id.*)

Further, the National Audit Office found that "when SKAT received information from

the public about the assumed fraud" in June 2015, "it knew that the number of requests and the

total reimbursement amount had increased significantly and . . . that the internal controls were

inadequate." (*Id.*)  And, therefore, the National Audit Office concluded that "SKAT should have

looked into the area more closely before making any further reimbursements" after June 2015.

(*Id.*)  Finally, the National Audit Office concluded that "the Ministry of Taxation's supervision

was fragmented and passive" and "that very simple analyses of the development in the

reimbursements of dividend tax would have pointed to problems in the area that should have

resulted in a closer look at the area." (*Id.* at 5.)

## LEGAL STANDARD

"A district court's inherent authority to manage the course of its trials encompasses the

right to rule on motions *in limine*."  *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d

173, 176 (S.D.N.Y. 2008).  Motions *in limine* "aid the trial process by enabling the Court to rule

in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely

set for trial, without lengthy argument at, or interruption of, the trial."  *Stoncor Grp., Inc. v.

Peerless Ins. Co.*, 573 F. Supp. 3d 913, 917 (S.D.N.Y. 2021) (quoting *Palmieri v. Defaria*, 88

F.3d 136, 141 (2d Cir. 1996)).  This includes excluding irrelevant and unfairly prejudicial

evidence under Federal Rules of Evidence 401, 402 and 403 before the evidence is introduced at

trial.  *See, e.g., Ordonez v. A& S Broadway Produce Inc.*, No. 14-cv-4152 (NSR)(JCM), 2015

WL 5729415, at *1 (S.D.N.Y. Sept. 29, 2015).

"Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.  Thus, "relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in a case." *LNC Invs., Inc. v. First Fid. Bank*, No. 92 Civ. 7584 CSH, 2000 WL 1072460, at *4 (S.D.N.Y. Aug. 3, 2000) (citation omitted).  If an item of evidence "does not tend to prove a material fact," *i.e.*, "one that would affect the outcome of the suit under the governing law," then "it is irrelevant."  *Arlio v. Lively*, 474 F.3d 46, 52 (2d Cir. 2007) (internal quotation omitted).

Under Federal Rule of Evidence 403, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues," or "misleading the jury."  Fed. R. Evid. 403.  The Court has "broad discretion to exclude relevant evidence if its probative value is substantially outweighed by the danger of confusion of the issues or if it would be needlessly cumulative" and "to balance the evidence's potential prejudice . . . against its probative value."  *Highland Cap.*, 551 F. Supp. 2d at 176-77 (quotations omitted).

## ARGUMENT

The Court should exclude from trial all evidence relating to the challenges in SKAT's administration of dividend tax identified in Mr. Jeppesen's 2007 memorandum concerning stock loans, Ms. Rømer's Problem Catalog, SIR's internal audit reports, and the National Audit Office's report.  None of the issues identified therein have any bearing on the parties' claims or defenses in these cases, including when SKAT knew, or should have known, of its claims, or whether SKAT was negligent in paying defendants' tax refund claims that they maintain today were paid out correctly.  And the conclusions in SIR's 2015 report and the National Audit Office's 2016 report concerning SKAT's controls and that increases in refund claims should have been investigated sooner are unfairly prejudicial in that they risk the jury deferring to SIR's

12

and Audit Office's conclusions, rather than deciding the issues themselves based on the admissible evidence and the Court's instructions of law.

Under Danish law, the three-year limitations period on SKAT's claims was suspended and did not start to run until SKAT "knew or should have known of its claims against defendants." *In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.*, No. 18-md-2865 (LAK), 2023 WL 8039623, at *14 (S.D.N.Y. Nov. 20, 2023) (internal quotation omitted). And as SKAT has previously explained, the "test for whether [SKAT] 'should have' become aware of its claim" against a particular defendant is "whether [SKAT] had sufficient information for a prudent person acting in [SKAT's] shoes to assess the basis for its claim" against the defendant. (Pl.'s Mem. of Law on Issues of Disputed Foreign Law and Choice of Law, at 6, ECF No. 1071 (quoting Mads Bryde Andersen Decl. ¶ 159, dated June 24, 2024).) "Danish law does not impose on SKAT a duty to make active investigations (like police investigations in criminal matters) of all facially sufficient tax refund applications it receives on a presumption that facts of relevance to the case may be hidden somewhere." *In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.*, 2023 WL 8039623, at *15 (citation omitted).

Thus, while the Court previously held that "whether SKAT knew, or should have known, that the defendants' tax refund applications were fraudulent is a fact-bound question that must await trial," "none" of the issues concerning SKAT's administration of dividend tax of which it was aware before defendants' fraud "demonstrate that SKAT knew or should have known of its claims against the defendants." *Id.* at *15-16. "The specific fraud that defendants are alleged to have committed does not have to do with the purchase of borrowed shares, the risk of multiple claims to ownership of the same shares, determining the ultimate foreign beneficial owner of

13

shares, or any of the other issues identified." *Id.* at *15. And SKAT had no duty under Danish law to investigate defendants' refund claims to confirm their representations of share ownership and dividend receipt were in fact true.

For the same reasons, evidence of SKAT's awareness of issues concerning claims based on borrowed shares and omnibus accounts is irrelevant to defendants' arguments that SKAT did not pay the defendants' tax refund claims by mistake or reasonably rely on defendants' fraudulent representations in their refund claims. None of the identified issues in the dividend withholding tax administration has anything to do with whether SKAT should have known that defendants' refund claims were fraudulent. Nor are the issues of stock loans and omnibus accounts at all relevant to whether SKAT was negligent in paying defendants' refund claims because none of the issues identified contributed to SKAT's injuries. *See Kwiatkowski v. Bear, Stearns & Co.*, No. 96 Civ. 4798(VM), 2000 WL 640625, at *2 (S.D.N.Y. May 18, 2000) ("comparative fault is intended to address . . . the cause of plaintiff's damages").[4]

**Mr. Jeppesen's 2007 memorandum**: The purported "control problem" Mr. Jeppesen identified was that when shares are lent pursuant to a stock loan agreement "the same shareholding can legally be included simultaneously in the holding[s] of several owners[,] but only the actual (original) owner can receive dividends from it in a tax sense." (Weinstein Decl. Ex. 1 at 4.) In short, it created potential confusion as to whether the lender or borrower was entitled to the refund, and the possibility that both might in good faith submit a refund claim

---

4. These issues also are irrelevant to the equities of SKAT's restitution claims. In determining whether "equity and good conscience" require the defendant to return the benefit to the plaintiff, "courts look to see if a benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if there has been otherwise a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent." *Columbia Mem'l Hosp. v. Hinds*, 192 N.E.3d 1128, 1137 (N.Y. 2022) (quoting *Paramount Film Distrib. Corp. v. State of New York*, 285 N.E.2d 695, 698 (N.Y. 1972). Nothing about SKAT's administration of dividend withholding tax has any bearing on such matters.

based on the same underlying shares.  SKAT does not claim that defendants' fraud involved refund claims based on borrowed shares, nor do the defendants claim that they obtained the shares by borrowing through a stock loan.  Nor did the fraud involve multiple parties, *e.g.*, a share lender and borrower, submitting refund claims based on the same dividend payment on the same share.  Rather, defendants' claims were fraudulent because they purported to purchase, not borrow, shares that did not exist.

Thus, evidence concerning what SKAT knew about the risks of wrongful refund claims based on stock loans has no bearing on when SKAT should have known that defendants' refund claims based on non-existent shares were fraudulent.  And such evidence is likewise irrelevant to whether SKAT was comparatively negligent in paying the defendants' refund claims where they did not even purport to borrow shares.  Rather, such evidence would only serve to confuse and mislead the jury into thinking that what matters is whether SKAT knew about any risks in dividend withholding tax—not when SKAT should have known of its claims against defendants.

**Ms. Rømer's Problem Catalog**: That Ms. Rømer identified before defendants started submitting their fraudulent refund claims that SKAT was unable to confirm the owner of shares held in omnibus accounts at VP Securities is likewise irrelevant.  Defendants did not hold any shares in omnibus accounts at VP Securities.  And there is no argument that SKAT's inability to confirm the ultimate owner of every Danish share (an inability inherent in the nature of omnibus accounts in the securities industry, rather than one due to lack of effort on SKAT's part) means that SKAT should have realized defendants' refund claims were fraudulent or that SKAT was negligent in relying on the third-party documentation of ownership defendants submitted with their refund claims.  Rather, evidence of SKAT's awareness that it could not confirm the owners of shares held in omnibus accounts would only confuse and mislead the jury into thinking SKAT

was required to confirm (or that it was even possible for SKAT to confirm) such ownership before paying a refund claim and could not rely on the representations made and custodial documents submitted by the claimant as sufficient proof of dividend receipt.

**SIR's 2006 report**: Nothing in SIR's 2006 audit report has any bearing on any material fact in this case. The report's few criticisms of SKAT's administration of dividend withholding tax refunds were resolved before the defendants started submitting fraudulent tax refund claims to SKAT and have nothing whatsoever to do with SKAT's knowledge of defendants' fraud or payment of their refund claims. For instance, the report concluded "[t]hat dividend tax control has not been satisfactorily performed as a result of the lack of satisfactory system support," *i.e.*, because of the software SKAT used at the time for administering dividend withholding tax. (Weinstein Decl. Ex. 5 at 3.) But as the report itself noted, that issue was "expected to be" (and was) resolved "with the decision to introduce" new software in January 2006. (*Id.*) And the report found it unsatisfactory "that in certain situations, it is possible for dividend recipients to receive dividend tax, even if the company paying the dividend has not paid the withheld tax to SKAT." (*Id.* at 4.) But that issue, which was simply one of timing, was also resolved by legislation passed by the Danish Parliament in 2012 extending SKAT's deadline to pay refund claims to six months before interest begins to accrue, thereby allowing SKAT to wait to pay refund claims until after the issuing company paid the entirety of the withholding tax to SKAT. (Weinstein Decl. Ex. 2 (Rømer Dep. Tr.) 237:6-238:7.)

**SIR's 2010 report**: The issues identified in the 2010 audit report also are irrelevant to SKAT's knowledge of defendants' fraud or payment of their tax refund claims. That SKAT's Accounting 2 department thought that "the use of Omnibus accounts means that several dividend notes are printed (SWIFT messages) for a single share" has nothing to do with defendants' fraud

that did not involve any shares in the first place.  (Weinstein Decl. Ex. 6 at 12.)  Nor is it relevant that the report concluded "[t]here is no check as to whether dividend tax is requested more than once per share."  (*Id.*)  Defendants' fraud did not involve claiming more than one refund based on the same underlying shares and dividend payments.

And the report's observation that "there are no checks in connection with refund requests as to whether the investor is actually a shareholder and whether the investor is in fact liable for tax in Denmark" (*Id.* at 8), is essentially a repeat of Ms. Rømer's observation that SKAT could not confirm ownership of shares held in omnibus accounts, and is irrelevant for the same reason.[5]  SKAT relied on the statements of the refund claimant's custodian to verify ownership of shares and dividends.  Finally, even if the report did have some minimal relevance, evidence and testimony concerning it is likely to confuse the jury with tangential issues concerning SKAT's administration of dividend withholding tax and mislead it into thinking SKAT was required to check the defendants' ownership of shares and dividends beyond the evidence defendants included in their refund claims.

**SIR's 2013 report**: The 2013 report's finding that "SKAT's control of refund requests submitted via the spreadsheet scheme is not sufficient" is plainly irrelevant because (again) defendants did not use the "spreadsheet scheme" to commit their fraud.  (Weinstein Decl. Ex. 7 at 6.) The only purpose of introducing evidence of SIR's conclusion that SKAT's control of the "spreadsheet scheme" was "not sufficient" would be to mislead the jury to the improper inference that if SKAT's control of the "spreadsheet" scheme was insufficient, its control of the

---

5.   For instance, the report noted that "omnibus accounts and nominee accounts . . . mean that the real owners of the shares are not known, so refunds are paid without proof of ownership and actual distribution."  (*Id.*)

form scheme must have been insufficient too.  With respect to the form scheme, the 2013 report concluded that SKAT "assessed" the "basis" for the refunds "before" they were paid.  (*Id.* at 6.)

**SIR's 2014 report**: The 2014 report concerning SKAT's follow up on SIR's recommendations is irrelevant for the same reasons as are SIR's conclusions in its previous reports.

**SIR's 2015 report**: SIR's 2015 report concerns the same irrelevant issues identified in the previous audit reports and should be excluded for the same reasons.  Further, to the extent the Court concludes the issues concerning SKAT's controls discussed in SIR's 2015 and previous reports are relevant and admissible, the conclusions in the 2015 report that SKAT's controls were insufficient should be excluded under Rule 403 as unfairly prejudicial.  If such issues are relevant, the jury should make its own determination on SKAT's controls based on the underlying evidence.  *See United States v. Murgio*, No. 15-CR-769 (AJN), 2017 WL 365496, at *16 (S.D.N.Y. Jan. 20, 2017) ("given that the underlying evidence on which the NCUA relied is likely to be admitted at trial, and that evaluative conclusions . . . are either relevant to or specifically address ultimate issues of fact for the jury, the only effect of introducing such conclusions for their truth would be to place the NCUA's imprimatur on the Government's preferred interpretation of the evidence").  Indeed, the SIR's 2015 report was prepared in just four weeks and issued just months after SKAT was first alerted to fraud and before SKAT or SIR knew how the fraud had been perpetrated.  Introducing the report's conclusions at trial would risk a confusing contest between the parties "over how the evidence admitted at trial compare[s] to the evidence considered by" SIR.  *Sulton v. Lahood*, No. 08 Civ. 2435(PKC), 2009 WL 3815764, at *2 (S.D.N.Y. Nov. 6, 2009) (quoting *Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60, 65 (2d Cir. 1998)).

Finally, even if parts of the 2015 report were relevant and not unfairly prejudicial, the Court should nonetheless exclude the plainly irrelevant parts of the approximately 70-page report, including, for instance, its description "of the Ministry of Taxation's initiatives to strengthen processes and controls" and "[p]roposal[s] for future administration." (Weinstein Decl. Ex. 9 Sections 17, 20.)  And the analysis in section 7 of the report should be excluded because as SIR acknowledged, "the data" that SIR "used in connection with" that "analysis . . . could be incorrect." (*Id.* at 6.)

**The National Audit Office's 2016 report**: The same as SIR's 2015 report, the National Audit Office's 2016 report is irrelevant because it just goes over again the same issues identified in SIR's previous reports that have nothing to do with how the defendants perpetrated their fraud on SKAT.

And even if the Court were to conclude that SKAT's awareness of general issues with respect to its administration of dividend withholding tax were relevant, the report's conclusions that for instance the Ministry of Taxation should have investigated sooner the increase in refund claims and payments and that SKAT's "reimbursement" of tax refund claims "was made on a completely inadequate basis and SKAT did not check completely basic information in the requests" (Weinstein Decl. Ex. 10 at 4), should be excluded under Rule 403 as unfairly prejudicial.

The National Audit Office's conclusions with respect to when the Ministry of Taxation or SKAT should have investigated or what such investigations would have shown were not a determination of when SKAT should have known of its claims within the meaning of Danish law on the statute of limitations.  Thus, "presenting the jury with the" National Audit Office's "findings" that the Ministry of Taxation should have investigated the increase in refund

payments before the fraud was discovered or that SKAT should have stopped paying all refund

claims in June 2015 "would muddle the" Danish law statute of limitations "standard" the jury "is

meant to apply and predispose the jury to adopting the same findings." *McLeod v. Llano*, No.

17-CV-6062 (ARR) (RLM), 2021 WL 1669732, at *4 (E.D.N.Y. Apr. 28, 2021). And it would

give "rise to a likelihood that the trial will deteriorate into a protracted and unproductive struggle

over how the evidence admitted at trial compares to the evidence considered by the" National

Audit Office. *Casmento v. Volmar Constr., Inc.*, No. 20-CV-0944 (LJL), 2022 WL 1094529, at

*2 (S.D.N.Y. Apr. 12, 2022) (internal citation omitted). The same as SIR with respect to its

2015 report, the National Audit Office did not even know the means by which defendants

committed their fraud when it issued its report in early 2016.

      The same is true with respect to the National Audit Office's conclusions concerning

SKAT's controls. To the extent SKAT's controls are relevant, the jury should make its own

determination of their import based on the Court's instruction of law and the underlying

evidence. *See Arlio,* 474 F.3d at 53 ("District courts must assiduously guard juries against the

siren song of irrelevant and prejudicial prior determinations."). Showing the jury the National

Audit Office's conclusions that SKAT's administration of dividend withholding tax refunds was

"very unacceptable" or "extremely inadequate," (Weinstein Decl. Ex. 10 at 3), may result in "the

jury" feeling "a strong compulsion to conform their verdict to the conclusion[s] of the" National

Audit Office. *Id.* And since "the issues addressed in the" National Audit Office's report "and

those that are [the] subject of this trial are different," the report "would tend to confuse the issues

in the minds of the jury." *McClain v. Pfizer Inc.*, No. 3:06-CV-01795-VLB, 2010 WL 746777,

at *2 (D. Conn. Mar. 1, 2010) (excluding reports that include "conclusions that are within the

exclusive domain of the jury and are based on facts which are expected to be introduced at trial").

 **<u>Finally</u>**, admitting all these materials of at best marginal relevance into evidence "would cause the trial to digress into innumerable arguments related to myriad issues, causing undue prejudice, extensive delay, and confusion." *In re September 11 Litig.*, 621 F.Supp.2d 131, 157 (S.D.N.Y. 2009). Defendants questioned nine witnesses about these documents at their depositions. If all this evidence is admitted, SKAT would be required to offer its own "impeaching arguments and evidence" concerning the identified issues with respect to its administration of dividend withholding tax and how each was or was not resolved, including with respect to Denmark's efforts to participate in the OECD's proposed TRACE system that never came to fruition. *Id.* at 158.

## CONCLUSION

For the reasons set forth above, SKAT respectfully requests that the Court grant its motion *in limine* to exclude the evidence concerning SKAT's administration of dividend withholding tax in (i) Mr. Jeppesen's 2007 memorandum, (ii) Ms. Rømer's Problem Catalog and other memoranda concerning the same matters, (iii) SIR's reports, and (iv) the National Audit Office's report.

Dated: New York, New York
      August 15, 2024

HUGHES HUBBARD & REED LLP

By: /s/ Marc A. Weinstein
William R. Maguire
Marc A. Weinstein
Neil J. Oxford
Dustin P. Smith
Gregory C. Farrell
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Fax: (212) 422-4726
bill.maguire@hugheshubbard.com
marc.weinstein@hugheshubbard.com
neil.oxford@hugheshubbard.com
dustin.smith@hugheshubbard.com
gregory.farrell@hugheshubbard.com

*Counsel for Plaintiff Skatteforvaltningen*
*(Customs and Tax Administration of the*
*Kingdom of Denmark)*