# Exhibit 139

# Freshfields Bruckhaus Deringer

Duet Asset Management Ltd
For the attention of Mr Vijaya Sankar
27 Hill Street
London W1J5LP
UK

BRUSSELS
Bastion Tower
Place du Champ de
Mars/Marsveldplein 5
B-1050 Brussels
T +32 2 504 7000
Direct T +32 2 504 7011
F +32 2 504 7200
Direct F +32 2 404 7011
E robert.neyt@freshfields.com
W freshfields.com

DOC ID BRU4387565/1
OUR REF RN/AXH
YOUR REF
CLIENT MATTER NO. 152352-0005

18 December 2012

Dear Sirs

**Investment in Belgian shares**

You have asked us to express our opinion on the following issues

(a) Would Mill River Capital Management Pension Plan (the ***Pension Plan***) qualify as a "pension fund" as defined in article 3.1. k) of the Belgian – American double tax treaty of 27 November 2006 (hereafter the ***Treaty***);

(b) Would the Pension Plan qualify as a US Resident under article 4.3 a) of the Treaty; and

(c) Would the Pension Plan be entitled to the benefit of the dividend withholding tax exemption provided for under article 10.4 b) of the Treaty with respect to dividends made payable by Belgian listed companies (the ***Belgian Issuer(s)***) to Gibraltar LP, a Gibraltar Limited Partnership established as a private fund (the ***Partnership***) to which the Pension Plan is a Limited Partner. In this respect, the following questions arise:

(i) Whether the Pension Plan would qualify as beneficial owner of such dividends; and

(ii) Whether the dividends should not be considered to be derived from the carrying on of a business by the Pension Plan or through an associated enterprise.

Freshfields Bruckhaus Deringer LLP is a limited liability partnership registered in England and Wales with registered number OC334789. It is authorised and regulated by the Solicitors Regulation Authority. For regulatory information please refer to www.freshfields.com/support/legalnotice.

A list of the members (and of the non-members who are designated as partners) of Freshfields Bruckhaus Deringer LLP and their qualifications is available for inspection at its registered office, 65 Fleet Street, London EC4Y 1HS or at the above address. Any reference to a partner means a member, or a consultant or employee with equivalent standing and qualifications, of Freshfields Bruckhaus Deringer LLP or any of its affiliated firms or entities.

Abu Dhabi Amsterdam Bahrain Barcelona Beijing Berlin Brussels Cologne Dubai Düsseldorf Frankfurt am Main Hamburg Hanoi Ho Chi Minh City Hong Kong London Madrid Milan Moscow Munich New York Paris Rome Shanghai Tokyo Vienna Washington

KLUGMAN00061661

2|12

1.    **DESCRIPTION OF THE TRANSACTION**

1.    The Pension Plan is a trust forming part of a pension plan qualified under Code section 401A of the US Tax Code. The Trust Agreement of the Pension Plan provides that Pension Plan is created for the purpose of *"receiving contributions made under the Plan, accumulating, managing and investing those contributions, and providing benefits to the Participants and their Beneficiaries"*. The Trust Agreement furthermore provides that *"The Trust shall be administered for the exclusive purpose of providing benefits to the Participants and their beneficiaries and defraying reasonable costs of administration. This Trust and the Plan are intended to satisfy all of the requirements for a qualified retirement plan under the appropriate provisions of the Internal Revenue Code, ERISA and other applicable federal and state law.* (see Trust Agreement in annex 1)

2.    The Pension Plan is the limited partner to the Partnership and has full economic interest in the Partnership.

3.    The Partnership is a limited partnership under Gibraltar law and will be managed and controlled by a General Partner established in Gibraltar. The Limited Partnership agreement is attached in annex 2 (the ***Limited Partnership Agreement***).

4.    The Partnership is considered to be tax transparent for Gibraltar law purposes, as is to be confirmed by the Government of Gibraltar. For US law purposes the Partnership is subject to Subchapter K and hence treated as tax transparent. This is typically confirmed in form 8832 issued by the IRS.

5.    The general partner of the Partnership, (the ***General Partner***) will appoint Duet Asset Management Limited, as the asset manager to the Partnership.   Duet Asset Management Limited is an FSA regulated asset management company, resident in the United Kingdom.

6.    The Partnership will undertake a delta one market neutral trading strategy over Belgian shares, consisting of capturing the basis difference between the price of the shares and the price of the derivatives that can be traded in the market. The Partnership will acquire in a principal capacity listed Belgian shares from third party inter dealer brokers.  The Belgian shares will be acquired before record date and will settle before, on or after record date.

BRU4387565/1

3 | 12

7.      The Partnership will hedge its share positions by way of derivative instruments (e.g. futures or other derivatives such as swaps) and these will always be cash settled. The counterparties to the over the counter derivatives will not be resident in Belgium. For listed derivatives, the Central Counterparty will be the counterparty.

8.      Depending on liquidity and pricing in the market, the share positions and derivatives will be closed out at a point in time.

9.      When the Partnership acquires and holds listed Belgian shares, it will retain all rights to the shares (including voting rights) and none of these rights will be passed through to its derivative counterparty. Further, there will be no restrictions, subject to any provisions per the financing documentation with a third party bank, as to what the Partnership can do with the shares (i.e. it can at its own discretion choose to sell, re-hypothecate or lend the shares).

10.     The Partnership will seek leverage from a third party bank.

11.     The Partnership will enter into a subordinated loan facility with a third party. The facility will have the purpose of providing any required margin for transactions to be entered into by the Partnership. As an alternative, the third party will provide a guarantee to the Partnership. The third party will receive a loan origination fee (plus a stated interest rate) or a guarantee fee, as appropriate (see annex 3). The size of the subordinated loan / guarantee provided to the Partnership when compared to the size of the investment by the limited partner in the Partnership is dependent on the trading opportunities and may be large.

12.     Following the Limited Partnership Agreement the activities that are carried out by the Partnership under the Limited Partnership Agreement solely consist of the investment, in the name of the Partnership but for the account of the Limited Partner, of the partnership assets and the profits and losses of the Partnership that are economically allocated to the Limited Partner in accordance with its interest in the partnership. (see the Limited Partnership Agreement in annex 2).

13.     The above under section 1 is referred to as the ***Transaction***.

## 2.      SUMMARY OF THE OPINION

1.      Based upon and subject to the description of the Transaction, the assumptions and the matters set out in section 4, we are of the opinion that:

   (a)     The Pension Plan should qualify as a "pension fund" as defined in article 3.1. k) of the Treaty;

KLUGMAN00061663

4|12

(b)    The Pension Plan should qualify as a US resident in application of article 4.3 a) of the Treaty;

(c)    The Pension Plan should be entitled to benefit from the withholding tax exemption provided for under article 10.4 b) of the Treaty for dividends made payable by Belgian Issuers to the Partnership. The Pension Plan should in this respect qualify as the beneficial owner of these dividends and the dividends should not be considered to be derived from the carrying on of a business by the Pension Plan or through the Partnership.

## 3.    ASSUMPTIONS

With your permission and without further enquiry, we have assumed that:

(a)    The description of the relevant facts in the description of the Transaction is accurate and complete.

(b)    Each agreement constitutes a legal, valid and binding obligation of the parties, enforceable against those parties in accordance with its terms.

(c)    Each of the parties to the various agreements regards the terms of each of the agreements they have entered into as accurately reflecting the legal relationship they wish to create between them and that such agreements will form the basis of the entire agreement between the parties (with no other (written or oral) agreement or arrangement behind it expressing any different true intentions).

(d)    The Pension Plan is entirely managed and controlled in the United States so that the issue whether the Pension Plan does qualify as a US resident is dependent on our legal analysis of article 4.3 a) of the Treaty, without the need for us to verify the factual elements relating to the tax residency of the Pension plan;

(e)    Confirmation of the tax transparent treatment of the Partnership will be obtained, in Gibraltar via a ruling and for US tax purposes typically via a form 8832 issued by the IRS confirming that the Partnership is subject to Subchapter K for US law purposes.

(f)    Neither the Partnership, nor the Pension Plan, nor the General Partner has a permanent establishment in Belgium to which the Transaction or part thereof would need to be allocated.

KLUGMAN00061664

5|12

(g)     The Belgian Issuers are Belgian tax resident entities both for the application of Belgian domestic tax law and for the application of any tax treaty between Belgium and any other jurisdiction, not acting through a non-Belgian permanent establishment.

(h)     The Transaction and all related elements will be disclosed appropriately and correctly in all relevant tax returns.

**4.     DETAILED ANALYSIS OF THE OPINION**

*A) Application of article 3.1. k) of the Treaty - "Pension Fund"*

1.     If the Partnership is treated as tax transparent for treaty purposes as assumed (see Assumption (e) above), the Pension Plan should need to be able to invoke the application of the Treaty between Belgium and the US. Prior to the question whether the Pension Plan, which is established in the US, is a resident as described in article 4 of the Treaty that is entitled to Treaty benefits, the question arises whether the Pension Plan falls under the definition given to the notion "pension fund" under the Treaty.

2.     The Treaty defines under article 3.1. k) that:

*"the term "pension fund" means any person established in a Contracting State that is:*

*i) operated principally:*

   *A) to administer or provide pension or retirement benefits; or*

   *B) to earn income for the benefit of one or more arrangements described in A); and*

*ii) is either:*

   *A) in the case of Belgium (...); or*

   *B) in the case of the United States, exempt from tax in the United States with respect to the activities described in clause i) of this subparagraph."*

KLUGMAN00061665

6 | 12

3.    The Technical explanation to article 3.1. k) of the Treaty[1] (the **Technical Explanation**), includes a list of persons that qualify as pension funds under US domestic law and that are therefore protected by the Treaty. This list encompasses a trust providing pension or retirement benefits under a Code section 401A qualified pension plan.

    *"Subparagraph (k) defines the term "pension fund" to include any person established in a Contracting State that is operated principally to administer or provide pension or retirement benefits or to earn income for the benefit of one or more such arrangements and, in the case of Belgium [...], or in the case of the United States, generally exempt from income taxation with respect to such activities.*

    *In the case of the United States, the term" pension fund" includes the following: a trust providing pension or retirement benefits under a Code section 401(a) qualified pension plan, profit sharing or stock bonus plan, a trust providing pension or retirement benefits under a Code Section 403(b) plan, [...]."*

4.    Hence, as the Pension Plan qualifies under Code section 401A, as confirmed in form 6166 issued by the IRS (see annex 4), the Pension Plan should qualify as a "pension fund" as defined in article 3.1. k) of the Treaty.

### B) Application of article 4.3. a) of the Treaty - US Resident

5.    Only residents as described in article 4 of the Treaty are entitled to claim any Treaty benefits. Paragraph 3 of article 4 explicitly provides that pension funds, even if they are tax-exempt entities, are regarded as residents of a contracting state entitled to Treaty benefits.

6.    The Pension Plan, which qualifies as "pension fund" as defined in article 3.1. k) of the Treaty, should thus be able to qualify as a resident under the Treaty.

### C) Application of article 1.6 of the Treaty

7.    Article 1.6 of the Treaty provides that:

    *"An item of income, profit or gain derived through an entity that is fiscally transparent under the laws of either Contracting State shall be considered to be*

---

[1] Full title: *"Department of the treasury – Technical explanation of the convention between the government of the United States of America and the government of the Kingdom of Belgium for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income signed at Brussels on November 27, 2006".*

KLUGMAN00061666

*derived by a resident of a State to the extent that the item is treated for purposes of the taxation law of such Contracting State as the income, profit or gain of a resident."*

8.   If the Partnership is considered fiscally transparent both under the laws of Gibraltar and of the US, taxation takes place at the level of the partners, i.e. the Pension Plan.. This is to be confirmed by the Gibraltar authorities in a ruling and for US tax purposes typically by a form 8832 issued by the IRS confirming that the Partnership is subject to Subchapter K for US law purposes.

9.   The Belgian ruling commission more than once confirmed the principle that, by virtue of article 1.6 of the Treaty, Belgian sourced dividends derived by US resident pension funds through a partnership established in a third state which is treated as tax transparent for US tax purposes, qualify as dividend payments under the Treaty and as such, all conditions being fulfilled (see D below), can benefit from an exemption of Belgian dividend withholding tax (rulings nr. 800.197, nr. 2012.010 and number 2012.009 ).

10.   Hence the income derived by the Pension Plan through the Partnership should be considered to be derived by the Pension Plan directly.

### D) Application of article 10.4 (b) of the Treaty - Dividend exemption

11.   Article 10.4 b) of the Treaty provides that:

*"4. Notwithstanding the provisions of paragraph 2, where the company paying the dividends is a resident of Belgium, such dividends shall not be taxed in Belgium if the beneficial owner of the dividends is:*

*a) (...)*

*b) a pension fund that is a resident of the United States, provided that such dividends are not derived from the carrying on of a business by the pension fund or through an associated enterprise."*

12.   This exemption should apply to the dividends made payable by the Belgian Issuer to the Partnership to which the Pension Plan is a limited partner.

   (a)   Indeed, the Pension Plan should qualify as a pension fund under article 3.1. k) of the Treaty, which should qualify as a resident of the US for Treaty purposes (see 4.1 – 4.6);

KLUGMAN00061667

8|12

(b)    The income derived through the Partnership should be considered to be derived by the Pension Plan (see 4.6 – 4.9)

(c)    Moreover, the Pension Plan, as limited partner to the Partnership, is economically entitled to the dividends that will be made payable by the Belgian Issuers to the Partnership and which are benefits derived from the investments made by the Partnership. Therefore, the Pension Plan should be considered to be the beneficial owner of these dividends.

The term "beneficial owner" is not defined in the Convention, and is, therefore, defined as under the internal law of the country imposing tax (i.e. the source country).

Notwithstanding the fact that the Partnership is a legal entity, its tax transparent treatment both in Gibraltar as well as in the US, (and the fact that its functioning rules make clear that any income derived by the partnership, is derived exclusively for the benefit of the limited partner), should lead to the application of article 10.4 b) of the Treaty with respect to Belgian dividends obtained by the US Pension Plan investing through the Partnership.

The Technical Explanation specifically addresses the exemption for Pension Funds as follows:

*"This rule is necessary because pension funds normally do not pay tax (either through a general exemption or because reserves for future pension liabilities effectively offset all of the fund's income), and therefore cannot benefit from a foreign tax credit. Moreover, distributions from a pension fund generally do not maintain the character of the underlying income, so the beneficiaries of the pension are not in a position to claim a foreign tax credit when they finally receive the pension, in many cases years after the withholding tax has been paid. Accordingly, in the absence of this rule, the dividends would almost certainly be subject to unrelieved double taxation."*

The above consideration, that the beneficial ownership should reside with the pension fund to avoid unrelieveable double taxation, clearly meets the observations regarding the notion "beneficial ownership" contained in the OECD Model Commentary:

*"the term 'beneficial owner' is not used in a narrow technical sense, rather, it should be understood in its context and in light of the object and purpose of*

KLUGMAN00061668

*the Convention, <u>including avoiding double taxation</u> and the prevention of fiscal evasion and avoidance."*

Taking into consideration the above and the fact that the Belgian tax authorities have consistently adhered to the above OECD guideline, the Pension Plan should be considered the beneficial owner of the dividends.

(d)   Finally, the dividends should not be considered to be derived from the carrying on of a business by the pension fund or through an associated enterprise.

In article 3.1. d) it is stated that the term *"enterprise"* applies to *"the carrying on of any business"*. The Treaty also specifies in article 3.1. e) that a *"business"* *"includes the performance of professional services and of other activities of an independent character"*. As the term *"business"* is not defined in the Treaty, this term should be construed in accordance with Belgian domestic law (see also administrative comments n°7/105).

The Belgian tax authorities have generally construed the term *"enterprise"* as referring to any economic entity that can generate profit from industrial, commercial or agricultural activity within the meaning of article 24 Belgian Income Tax Code (**BITC**).

Furthermore, article 182 BITC specifically provides the for non-profit entities, such as pension plans, the investment of funds collected in accordance with its statutory purpose does not qualify as transactions of a profit generating nature.

As the Pension Plan will be merely investing its funds through the Partnership and since neither the Pension Plan, nor the Partnership, will engage in any kind of industrial, commercial or agricultural activity these dividends should not be considered to be derived from the carrying on of a business.

## 5.   FINAL REMARKS

This letter is confined to matters of Belgian tax law and is not to be read as extending by implication to any matters non-specifically referred to herein. Accordingly, we express no opinion with regard to any system of law (including jurisdictions in which our firm has an office) other than the tax laws of Belgium, all as they stand as at the date hereof and as such laws are currently interpreted in as at the date hereof published case law of the courts of Belgian (***Belgian Tax Law***).

1.   In particular:

KLUGMAN00061669

10|12

(a)     Belgian legal and fiscal concepts are expressed in English terms and not in their original Dutch or French terms. It should be understood that the concepts concerned may not be identical to the concepts described by the same English terms as they exist in the laws of other jurisdictions. It should be understood that Belgian tax and legal questions would ultimately be determined before the Belgian courts in proceedings conducted in the Dutch or French language and applying Belgian legal and fiscal principles. We can assume no liability for any misunderstanding so caused to the extent that the translation in this letter of such concepts into English does not precisely reflect their meaning in the Dutch or French language.

(b)     The letter may only be relied upon on the condition that any issues of interpretation or liability arising hereunder shall be governed by Belgian law and be brought before a Belgian court.

(c)     This letter speaks as of the date hereof. It supersedes any previous letter or draft letter relating to the transaction and any such previous (draft) letter may not be relied upon. No obligation is assumed to update this letter or to inform any person of any changes of law or other matters coming to our attention or occurring after the date hereof which may affect this opinion in any respect. In particular we do not address the possible effects of any particular draft/proposed changes that may merit attention.

(d)     We have not been responsible for investigating or verifying the accuracy of the statements of fact (or statements of foreign law), or for verifying that no material facts have been omitted from the transaction description.

(e)     The letter is not to be read as extending by implication to any other matter in connection with the transaction or otherwise. The letter should not be relied upon for any purpose unconnected with the Transaction.

(f)     This opinion is prepared with professional diligence and care. However, it is not a guarantee of outcome or result. It should be understood that the expression in this letter of an opinion as to any matter does not provide assurance that a court or other tribunal, or any relevant (tax) authority, will not form a different conclusion.

(g)     This memorandum is solely for the benefit of Duet Asset Management Ltd, the Partnership and the limited partner. It relates only to the specific tax aspects under the Treaty and Belgian tax law of the proposed transaction which you have asked us to consider, and does not address any other tax, legal or regulatory aspects, or the position in other jurisdictions. This letter may be relied upon by you only and it may not be relied upon by, transmitted to or filed with any person, firm, company or

BRU4387565/1

KLUGMAN00061670

11|12

institution without our prior written consent, save that this memorandum may be disclosed on a non-reliance basis without our prior written consent to the Partnership.

Yours faithfully

Freshfields Bruckhaus Deringer LLP

KLUGMAN00061671

12|12

**6.    ANNEXES**

1.    Trust Agreement;

2.    Limited Partnership Agreement;

3.    Subordinated loan agreement; and

4.    Form 6166 issued by the IRS the Pension Plan.

BRU4387565/1

KLUGMAN00061672

DATED _____ 6 December 2012

**VALE GP LIMITED**

and

**DUET GROUP LIMITED**

**DEED OF LIMITED PARTNERSHIP**
**IN RESPECT OF**
**HAMLYN LP**

KLUGMAN00061673

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1 | DEFINITIONS | 1 |
| 2 | CONSTITUTION OF THE PARNERSHIP | 7 |
| 3 | SUBSCRIPTION, REDEMPTIONS AND ADDITIONAL PARTNERS | 9 |
| 4 | ALLOCATION OF PROFIT AND LOSES | 10 |
| 5 | DISTRIBUTIONS OF PROCEEDS | 11 |
| 6 | PARTNERSHIP ACCOUNTS, TAX INFORMATION AND REPORTS | 13 |
| 7 | OPERATION AND MANAGEMENT OF THE PARTNERSHIP | 14 |
| 8 | EXPENSES AND FEES | 18 |
| 9 | DEBTS AND LIABILITIES OF THE PARTNERSHIP | 19 |
| 10 | TRANSFERS OF PARTNERSHIP INTERESTS | 19 |
| 11 | MEETINGS OF THE PARTNERSHIP AND CONSENT MATTERS | 21 |
| 12 | TERMINATION AND LIQUIDATION | 21 |
| 13 | EXCULPATIONS AND INDEMNITIES | 23 |
| 14 | CONFIDENTIALITY | 24 |
| 15 | VARIATION OF PARTNERSHIP AGREEMENT | 26 |
| 16 | MISCELLANEOUS | 27 |
| SCHEDULE 1 – ADDITIONAL LIMITED PARTNERS | | 30 |
| SCHEDULE 2 – INVESTMENT POLICY | | 31 |

KLUGMAN00061674

**THIS AGREEMENT IS DATED** 6 December 2012

**BETWEEN**

(1)    **VALE GP LIMITED,** a company incorporated in Gibraltar under registration number 107542 whose registered office is at 210 Neptune House, Gibraltar ("**GP**"); and

(2)    **DUET GROUP LIMITED** a company incorporated in Hong Kong with registered number 1401864 and having registered office at Level 28, Three Pacific Place, 1 Queen's Road East, Hong Kong (the "**Initial Limited Partner**").

**INTRODUCTION**

(A)    Hamlyn LP ("the Partnership") has been registered as a limited partnership in Gibraltar under the Act with number 89.

(B)    The Partners will admit Additional Limited Partners to the Partnership on the terms of this Agreement.

(C)    The Initial Limited Partner shall cease to be a limited partner immediately upon the admission of the first Additional Limited Partner.

**IT IS HEREBY AGREED AS FOLLOWS**

1    **DEFINITIONS**

1.1    In this Agreement (including the Introduction and the Schedules), unless the context otherwise requires, the following words and expressions shall have the following meaning:

**"Accounting Date"**

30 November 2013  and 30 November  in each year thereafter or such other date as the General Partner may determine and notify to the Partners or (in the case of the final Accounting Period of the Partnership) the date when the Partnership is ultimately dissolved;

**"Accounting Period"**

a period ending on and including an Accounting Date and beginning on the day following the immediately preceding Accounting Date or, in the case of the first Accounting Period, on the date of establishment of the Partnership;

**"Act"**

the Gibraltar Limited Partnership Act 1927;

**"Additional Limited Partner"**

any person admitted as a Limited Partner before, on or after the Initial Subscription Closing Date pursuant to clause 3.1 (*Admission of Additional Limited Partners*) ;

**"Administrator"**

Velay Financial Services Limited;

**"Agreement"**

this limited partnership agreement;

**"Asset"**

an asset acquired by the Partnership (either directly or indirectly or by another person on its behalf) for the purpose of investment or trading including, but not limited to, shares, debentures, convertible loan stock, options, warrants, futures, swaps or other securities or contracts;

KLUGMAN00061675

**"Associate"**

in relation to the person concerned, is:

(a)     if the person concerned is a body corporate, any holding company or parent undertaking or any subsidiary or subsidiary undertaking of such person or any subsidiary or subsidiary undertaking of any such holding company or parent undertaking of any partnership which is a subsidiary or subsidiary undertaking of such person or its holding company or parent undertaking; or

(b)     if the person concerned is an individual or a firm or other unincorporated body, any body corporate directly or indirectly controlled by such person;

**"Auditors"**

BDO Limited;

**"Financing Facility"**

the meaning given in paragraph 3 of Schedule 2 (*Investment Policy*);

**"Breach of the Standard of Conduct"**

with respect to any Indemnified Person, any act or omission constituting negligence, wilful misconduct, reckless disregard of duties or wilful breach of this Agreement which has had a material adverse effect on the Partnership or any act or omission constituting fraud by such Indemnified Person and, in the case of the General Partner, any material breach of duty or liability it may have to the Partnership under the laws of the Gibraltar, as determined, in each case by the final judgment of a competent court of law;

**"Business Day"**

a day (not being a Saturday or Sunday or a public holiday) on which banks are generally open for non-automated business in Gibraltar;

**"Capital Contribution"**

in relation to a Partner, the aggregate amount of capital contributed by such Partner to the Partnership pursuant to clause 3.4 (*Capital Contributions*), comprising 0.01% of its Subscription Amount;

**"Cause"**

the final determination of a court of competent jurisdiction that:

(a)     the General Partner or the Investment Manager has committed a material breach of any of their respective obligations under this Agreement or, in the case of the Investment Management, the Investment Management Agreement and, where such material breach is capable of remedy, such material breach has not been remedied within 30 Business Days of written notice of such material breach having been served on the General Partner by a majority of the Limited Partners and such material breach has resulted in material damage to the Partnership; or

(b)     the General Partner or the Investment Manager has been grossly negligent in carrying out their duties under this Agreement or, in the case of the Investment Manager, the Investment Management Agreement; or

(c)     the General Partner or the Investment Manager is insolvent, bankrupt or has gone into involuntary reorganisation;

for the purposes of paragraph (a) above, the General Partner and/or the Investment Manager will be deemed to have remedied the material breach if the employment or membership (as the

KLUGMAN00061676

case may be) of the relevant individual responsible for the breach is terminated within the provided time period;

**"EURIBOR"**

as at any date, the rate for deposits in Euros for the period of 3 months which appears on the appropriate page of Bloomberg on such date provided that if such rate does not appear on Bloomberg on such date, the rate shall be such rate as is reasonably determined by the General Partner in respect of such date;

**"Euro or €"**

the lawful currency of the member states of the European Union that have adopted the single currency in accordance with the treaty establishing the European Community (signed in Rome on 25 March 1957) as amended by the treaty on European Union (signed in Maastricht on 7 February 1992);

**"General Partner"**

GP (as constituted from time to time) or its successor for the time being as general partner of the Partnership;

**"General Partner's Fee"**

EUR 5,000 per EUR 1,000,000 of Net Asset Value calculated on the last Valuation Day of each calendar year and payable in accordance with clause 5.1.1.

**"Indemnified Person"**

any of the   Investment Manager, any Associate of it and officers, directors, employees, shareholders, partners, members, agents, advisers or consultants of the General Partner or the Investment Manager or its Associates (except the General Partner itself);

**"Initial Subscription Closing Date"**

31 December 2012;

**"Investment Manager"**

Duet Asset Management Limited or such other person who shall serve as investment manager pursuant to the terms of the Investment Management Agreement and this Agreement, or of any agreements entered into in substitution or replacement for such agreements;

**"Investment Management Agreement"**

the investment management agreement dated 6 December 2012 between the Investment Manager and the General Partner on behalf of the Partnership;

**"Investment Policy"**

the investment objectives, policies and restrictions of the Partnership as set out in Schedule 2 (*Investment Policy*);

**"Limited Partner"**

any person who is admitted to the Partnership as an Additional Limited Partner or Substitute Limited Partner (in each case, for so long as such person remains a limited partner in accordance with the terms of this Agreement);

KLUGMAN00061677

**"Listing"**

in relation to any Asset comprising securities, the admission of such securities to the official list of any stock exchange or market for dealing in securities and the quotation of such securities on such stock exchange or market;

**"Listing Price"**

the price at which an Asset comprising securities is sold or issued pursuant to an offer for sale or subscription or placed in connection with a Listing;

**"Loan" or "Loan Contribution"**

in relation to a Partner, any or all amounts of an interest-free loan advanced by such Partner to the Partnership pursuant to clause 3.5 (*Loans*) (whether or not such loan has been advanced to the Partnership or repaid to the Partner, in whole or in part) comprising 99.99% of its Subscription Amount;

**"Closing Price"**

the last traded price of a security as at the close of business on the relevant Business Day as published by the primary investment exchange on which the relevant security is traded;

**"Net Asset Value"**

The net asset value of the Partnership as determined on each Valuation Day at the close of business, determined by;

    (a)    ascertaining the total value of the Partnership Assets on the Valuation Day;

    (b)    Deducting from the amount at (a) above an amount equal to all accrued debts, liabilities and obligations (including managers, performance and professional fees) and any other contingencies(accrued contingent and prospective so far as the same can be quantified) for which the General Partner determines that reserves or accruals should be made;

**"Net Income"**

the amount greater than zero equal to the gross income of the Partnership including, without limitation, dividends, interest and other amounts reduced by expenses and losses of the Partnership;

**"Ordinary Consent"**

subject to compliance with clause 11.4 (*Consent Matters*), the written consent consisting of one or more documents in like form each signed by one or more of the Limited Partners who, at the time of providing such consent, have provided consents in respect of their Sharing Percentages which in aggregate exceed 50% of the total Sharing Percentages;

**"Outstanding Loan"**

in relation to a Partner, the amount of such Partner's Loan which, at the relevant time, has not been repaid (or deemed to be repaid) in accordance with the terms of this Agreement;

**"Partner"**

the General Partner and/or any of the Limited Partners, as the context requires;

**"Partnership"**

the meaning given in paragraph (A) of the Introduction;

KLUGMAN00061678

**"Subscription Agreement"**

a deed of adherence to be completed by each prospective Limited Partner on or before the date of its admission to the Partnership and by any Limited Partner making an additional subscription in such form as may from time to time be approved by the General Partner;

**"Subscription Amount"**

The amount paid by a Limited Partner to acquire its Partnership Interest comprising the Capital Contributions and Loan;

**"Subscription Day"**

The initial Subscription Closing Date and thereafter every first Business Day of each Calendar month;

**"Substitute Limited Partner"**

a person admitted pursuant to clause 10 (*Transfers of Partnership Interests*) as a Limited Partner, as the successor to all, or part of, the rights and liabilities of a Limited Partner in respect of such Limited Partner's Partnership Interest;

**"Taxation or Tax"**

all forms of taxation whether direct or indirect and whether levied by reference to income, profits, gains, net wealth, asset values, turnover, added value or other reference and statutory, governmental, state, provincial, local government or municipal impositions, duties, contributions and levies (including without limitation, social security contributions, national insurance contributions and any other payroll taxes), whenever and wherever imposed (whether imposed by way of a withholding or deduction for or on account of tax or otherwise) and in respect of any person and all penalties, charges, costs and interests relating thereto;

**"Tax Deduction"**

any Tax withheld by:

(a)    any person from dividends or interest or other amounts payable to the Partnership with respect to an Asset; and/or

(b)    the Partnership from dividends, interest or other proceeds payable to any Partner;

in each case pursuant to applicable law;

**"Transfer"**

the meaning given in clause 10.1 (*Transfer by the General Partner*);

**"Valuation Day"**

the last day of each calendar month or the immediately preceding Business Day if such day is not itself a Business Day;

**"VAT"**

value added tax imposed by the United Kingdom Value Added Tax Act 1994 or any tax or imposition of a similar nature which may be substituted in its place or any other value added or sales tax applicable in any other country.

1.2    References to the parties, the Introduction, clauses and the Schedules are respectively to the parties, the Introduction, the clauses and the Schedules of and to this Agreement.

1.3    References to a law or regulatory or statutory provision include that law or regulation or statutory provision as from time to time modified, re-enacted or consolidated whether

before or after the date of this Agreement so far as such modification, re-enactment or consolidation applies or is capable of applying to any transactions entered into in accordance with this Agreement, and (insofar as liability thereunder may exist or can arise) shall also include any statute or statutory provision (as from time to time modified, re-enacted or consolidated) which such statute or provision has directly or indirectly replaced except to the extent that any statutory provision law or regulation made or enacted after the date of this Agreement would create or increase the liability of any of the parties under this Agreement.

1.4    Unless the contrary intention appears:

1.4.1    words importing the masculine gender include the feminine;

1.4.2    words importing the feminine gender include the masculine;

1.4.3    words in the singular include the plural and words in the plural include the singular; and

1.4.4    references to a "**person**" include references to bodies of persons corporate or unincorporated.

2    **CONSTITUTION OF THE PARTNERSHIP**

2.1    **Nature**

2.1.1    The Partnership is a limited partnership and has been registered pursuant to the Act. The General Partner shall do all things and discharge all duties or requirements of or imposed on a general partner by the Act (whether or not on behalf of the Partnership) and in particular so as to ensure, so far as it is able, that the liability of the Limited Partners is and remains limited as provided in the Act. Where the General Partner is to take such actions on behalf of the Partnership it is hereby expressly authorised to do so accordingly.

2.2    **Purpose and ownership of Property**

2.2.1    The purpose of the Partnership is to carry on the business of investing and, in particular, of identifying, negotiating, making, monitoring the progress of and realising, exchanging or distributing Assets which will include the purchase, subscription, acquisition, sale and disposal of Assets with the principal objective of providing Partners with a return by means of income and/or short-term capital appreciation.

2.2.2    The Partnership (acting through the General Partner or persons authorised on behalf of the Partnership pursuant to this Agreement) may execute, sign, seal, deliver and perform all deeds, contracts and other obligations and engage in all activities and transactions as may in the sole opinion of the General Partner be necessary or advisable in order to carry out the purposes and objectives referred to in clause 2.2.1.

2.2.3    Each Partner owns an indivisible share in the Assets of the Partnership held by the Partnership in accordance with its Sharing Percentage.

2.3    **Name**

The business of the Partnership shall be carried on under the name and style or firm name of "Hamlyn LP" or such other name as the General Partner shall from time to time determine provided that the General Partner shall not be entitled to use any name in respect of the Partnership which includes the name of any Limited Partner without the prior written consent of such Limited Partner. The General Partner shall promptly notify the Partners in writing of any change to the Partnership's name.

7

KLUGMAN00061680

### 2.4 Principal Place of Business

The principal place of business of the Partnership shall be at 210 Neptune House, Gibraltar or such other place in Gibraltar as the General Partner may in its absolute discretion from time to time determine. The General Partner shall promptly notify the Partners in writing of any change to the Partnership's principal place of business.

### 2.5 Commencement

The Partnership was formed by General Partner and the Initial Limited Partner on the date specified in paragraph (A) of the Introduction. Any person admitted as an Additional Limited Partner pursuant to clause 3.1 (*Admission of Additional Limited Partners*), or a Substitute Limited Partner pursuant to clause 10 (*Transfers of Partnership Interests*) shall be a partner in the Partnership as from the date of its admission.

### 2.6 Duration

The Partnership shall continue until the seventh anniversary of the last day of the month in which the Initial Subscription Closing Date occurs unless terminated sooner in accordance with the provisions of clause 12.1 (*Termination*) or extended in accordance with the provisions of clause 12.4 (*Extension of Life of the Partnership*).

### 2.7 Registration in Other Jurisdictions

2.7.1    The General Partner may, where it deems it necessary or advisable for the Partners or the Partnership, cause the Partnership to be qualified or registered under its own or, if appropriate, a different name under foreign limited partnership statutes or similar laws or Taxation (or similar) laws or regulations in any jurisdiction in which the Partnership owns or intends to own property or transacts or intends to transact business in accordance with the terms of this Agreement or to market the Partnership in any such jurisdiction, if such qualification or registration is necessary or advisable:

    (a)    to protect the limited liability of the Limited Partners;

    (b)    to permit the Partnership lawfully to own property or transact business in such jurisdiction;

    (c)    to minimise any Taxation for the Partnership; or

    (d)    otherwise to comply with any Taxation (or similar) laws or regulations,

and the Partnership and each of the Partners hereby duly appoint and authorise the General Partner as its true and lawful attorney to do such acts, and to execute all such documents, as may be required in this regard and undertake to ratify and confirm any such actions.

### 2.8 Liability of Partners

2.8.1    Except as provided in this Agreement and in the Act, no Limited Partner shall have any personal obligation for the debts or liabilities of the Partnership. The liability of a Limited Partner shall be limited to the amount of its Capital Contribution, and such portion of its Outstanding Loan as has not for the time being been repaid.

2.8.2    The General Partner will without any limitation be liable for such of the Partnership's debts, liabilities and obligations as exceed the total liability of the Limited Partners.

### 2.9 Withdrawal of the Initial Limited Partner

The Initial Limited Partner will retire and withdraw as a limited partner of the Partnership with effect from the admission of the first Additional Limited Partner and will be released from all obligations to make further contributions and have its name removed from the register of Limited Partners.

8

3    SUBSCRIPTIONS, REDEMPTIONS AND ADDITIONAL PARTNERS

**Admission of Additional Limited Partners**

3.1    The General Partner may on any Subscription Day after the date hereof, admit to the Partnership any Additional Limited Partners who shall, by executing a Subscription Agreement or a counterpart thereof, agree to be bound by the terms of this Agreement provided that such admission shall take place on a Subscription Day. Admission of any new Additional Limited Partner shall be subject to the General Partner giving its consent and obtaining the prior written consent of all the other Limited Partners in the Partnership who is not a retired Limited Partner. Consent is not to be unreasonably withheld or delayed.

3.2    **Subscription Days**

Subscription for new Partnership Interests may be made on the first Business Day of each month and each Additional Limited Partner will receive a Partnership Interest and a Sharing Percentage at a price equal to the Partnership Interest Valuation determined by reference to the Net Asset Value of the Partnership, at the close of business on the previous Valuation Day. The Sharing Percentages of the other Limited Partners will be adjusted accordingly. The General Partner may, in its absolute discretion, accept a subscription on any other day, provided it is able to determine the Net Asset Value of the Partnership at the close of business on the Business Day immediately preceding such day.

3.3    **Subscription Amounts**

Subscription Amounts shall consist of a Capital Contribution and a Loan and shall be made in cash.

3.4    **Capital Contributions**

3.4.1    The General Partner shall not be required to make any contribution to the capital of the Partnership.

3.4.2    Each Limited Partner shall contribute the amount of its Capital Contribution in the form of cash being 0.01% of its Subscription Amount.

3.5    **Loans**

3.5.1    Each Limited Partner shall contribute the amount of its Loan contribution in the form of cash being 99.99% of its Subscription Amount.

3.5.2    The General Partner shall not be required to advance any loans to the Partnership.

3.6    **Redemptions**

Partnership Interests may be redeemed in whole or in part and a Limited Partner may retire from the Partnership, on the first Business Day following any Valuation Day, at a price equal to the Partnership Interest Valuation determined by reference to the Net Asset Value of the Partnership at the close of business on the immediately preceding Valuation Day. Following such redemption, the Sharing Percentage of the remaining Limited Partners shall be recalculated as at the Valuation Day. Capital Contributions cannot be returned until the winding up of the Partnership. The General Partner may, in its absolute discretion, accept a redemption request for any other day, provided it is able to determine the Net Asset Value of the Partnership at the close of business on the Business Day immediately preceding such day.

3.7    **Further Commitments**

Except with their written approval and on such terms expressly agreed by them, Limited Partners shall not be obliged to contribute any capital or make further loan contributions to the Partnership or otherwise contribute any funds to the Partnership in addition to their Capital Contribution and/or their Loan nor provide any credit support (including, but not limited to,

9

provision of guarantees) in respect to monies advanced to the Partnership. This provision shall not limit a Limited Partner's obligation to pay for expenses incurred on its behalf as expressly set out in any other clause of this Agreement.

### 3.8    Suspension of Redemption

The General Partner may suspend the calculation of the Net Asset Value and consequently may suspend the redemption of Partnership Interests and the right of Partners to retire from the Partnership in any of the following events:-

(a)    when any security exchange or organised inter-dealer market on which a significant proportion of the Assets is regularly quoted or traded is closed or trading thereon has been restricted or suspended;

(b)    when, as a result of political, economic, military or monetary events or any circumstances outside the control, responsibility or power of the Partnership, disposal of the Assets is not reasonable or practicable without being seriously detrimental to other Partners' interests;

(c)    if it is not reasonably practicable to determine the Net Asset Value on an accurate and timely basis;

(d)    if, as a result or exchange restrictions or other restrictions affecting the transfer of funds, transactions on behalf of the Partnership are rendered impracticable or if purchases and sales of the Partnership's Assets cannot be effected at normal rates of exchange;

(e)    when the Partnership is unable to the pay redemption proceeds as a result of difficulties in the realisation of Assets or due to a delay in the expected receipt of the proceeds due to the Partnership;

(e)    in the event that the General Partner deems such action will be detrimental to the remaining Partners.

### 3.9    Consent

Redemption of any Partnership Interest is subject to the General Partner giving its consent and obtaining the prior written consent of all the other Limited Partners in the Partnership who are not retired at the time of the redemption request under clause 3.10 below. Such consent is not to be unreasonably withheld or delayed.

### 3.10    Notice

Subject to Clause 3.8 (*suspension of redemptions*), Partnership Interests to be redeemed in whole or in part are subject to the receipt of 5 days prior written notice given by a Limited Partner to the General Partner, specifying the extent to which such Limited Partner wishes to reduce its Sharing Percentage. The General Partner may, in its absolute discretion, accept a shorter period of prior written notice.

### 3.11    Currency and No Interest

3.11.1    All contributions or advances by and distributions to the Partners, all calculations pursuant to the terms of this Agreement and all accounts of the Partners shall be made, prepared and maintained (as the case may be) in Euros in the case of a Partner that has made its contribution or advance in Euros and in U.S. dollars in the case of a Partner that has made its contribution or advance in U.S. dollars.

3.11.2    Notwithstanding clause 3.11.1, accounts for the profits and losses of the Partnership will be maintained in Euros and the Sharing Percentage of a Partner paying a

Subscription Amount in US Dollars will be calculated by reference to the Euro/US Dollar spot rate at close of business on the Valuation Day.

### 3.12 Repayment of the Outstanding Loans

The Outstanding Loans shall be repaid in accordance with the terms of clause 5 (*Distributions of Proceeds*), subject to the provisions of clauses 12.3.5 and 12.3.6 (*Liquidation*). Each of the Partners shall be a creditor in respect of the Outstanding Loan advanced by it on and subject to the terms of this Agreement to the extent that, subject to clauses 12.3.5 and 12.3.6 (*Liquidation*), the holder of the Outstanding Loan in question may sue for debt in respect of its Outstanding Loan and is not limited to a remedy by way of account. For the avoidance of doubt no Partner shall be entitled to demand the repayment of, or to be repaid its Outstanding Loan other than in accordance with the provisions of this Agreement.

### 3.13 Equalisation Arrangements

Partnership Interests upon subscription, and the proceeds of redemptions may be adjusted in accordance with provisions disclosed in the Private Placement Memorandum in connection with the payment of the performance fee of the Investment Manager.

### 3.14 Compulsory Redemptions

The General Partner shall have the right to compulsorily redeem Partnership Interests in whole or in part, at any time without notice, if in its absolute discretion it is in the best interests of the Partnership to do so. Any such redemption shall occur at a price equal to the Partnership Interest Valuation determined by reference to the Net Asset Value of the Partnership at the close of business on the last Business Day prior to such redemption.

## 4   ALLOCATION OF PROFITS AND LOSSES

### 4.1 Allocations between Partners

Every Partner has an interest in every asset of the Partnership and, accordingly, subject to the provisions of clause 10.3 (*Position of Substitute Limited Partner*), all Net Income shall be allocated between the Partners so that the balance in their respective accounts shall reflect their respective entitlements to receive distributions in accordance with clause 5 (*Distributions of Proceeds*). The General Partner's Sharing Percentage shall be limited to the General Partners' Fee.

### 4.2 Treatment of Distributions in Specie

If a decision is made to distribute any Partnership Assets in specie in accordance with clause 5.4 (*Distributions in Specie*), those assets shall be deemed to be realised for the purposes of computing Net Income at their Value arrived at in accordance with that clause.

## 5   DISTRIBUTIONS OF PROCEEDS

### 5.1 Application of Proceeds

5.1.1   In respect of each Accounting Period, there shall be allocated and paid to the General Partner the General Partner's Fee. The General Partner's Fee shall be paid as a priority share of all Net Income received by the Partnership. Such amount allocated to the General Partner shall reduce the amount of Net Income available for allocation in accordance with clause 5.1.2.

5.1.2   After payment of, or reservation of amounts for the payment of, the expenses and liabilities of the Partnership and subject to 5.3 (*Timing of Distributions*), 5.4 (*Distributions in Specie*) 5.5 (*Tax Deductions*) all Proceeds received by the Partnership will be provisionally apportioned amongst the Partners in accordance with their Sharing Percentage. The amounts (if any) apportioned to the General

KLUGMAN00061684

Partner shall be distributed to the General Partner.  The amounts shall be provisionally apportioned to each Limited Partner's income account.

5.1.3    Amounts distributed to Limited Partners shall first (for accounting purposes only) be treated as repayment of Outstanding Loans. Profits payable to a Partner who has paid its Subscription Amount in US Dollars will be payable in US Dollars converted at the prevailing conversion rate achieved by the Partnership on payment.

5.2    **Distributions and Re-investment**

Subject to the provisions of clauses 5.3 (*Limitations on Distributions*), Proceeds comprising Net Income shall be distributed in accordance with clause 5.1 (*Application of Proceeds*) as soon as practicable after receipt,  at the absolute discretion of the General Partner. Net Income available for distribution shall not be reinvested other than on cash deposit, or used to meet expenses of the Partnership.

5.3    **Limitations on Distributions**

5.3.1    The General Partner in its absolute discretion shall decide if the Partnership should make any  distribution pursuant to this clause 5, and in particular, shall not cause to be made a distribution:

    (a)    unless there is sufficient cash available;

    (b)    where such distribution would render the Partnership insolvent;

    (c)    which, in the reasonable opinion of the General Partner, would or might leave the Partnership with insufficient funds to meet any future obligations, liabilities or contingencies (including, without limitation, the General Partner's Fee in respect of any Accounting Period and any obligation or liabilities under any Financing Facility).

5.4    **Distributions in Specie**

5.4.1    If a distribution in specie is made under this clause 5.4 the General Partner shall use its reasonable endeavours to procure that a certificate representing the securities to which each Limited Partner is entitled pursuant to such distribution (where such securities are certificated) is sent to such Limited Partner and/or that appropriate steps are taken to record the transfer of title to such securities as appropriate.

5.4.2    All securities distributed in specie pursuant to this clause 5.4 shall for all purposes of this Agreement be valued at the mean of the Closing Price at the close of business on each of the five dealing days immediately preceding the date of distribution of such securities For the avoidance of doubt, any transfer Taxes payable on transfer of such securities shall be for the account of and be payable by the relevant Limited Partners.

5.4.3    Any Limited Partner not wishing to receive securities by way of a distribution in specie pursuant to this clause 5.4 may, upon receiving notice of such distribution, require the General Partner (or its nominee) to retain that Limited Partner's proportion of the securities to be distributed in specie pursuant to this clause 5.4 and that the General Partner, on behalf of such Limited Partner, use its reasonable endeavours to dispose of such securities and distribute the net proceeds of such disposal to such Limited Partner on such terms as may be agreed between the General Partner and such Limited Partner. Any such securities held by the General Partner (or its nominee) shall cease to be a Partnership Asset and shall be deemed to have been distributed in specie to the relevant Partner in accordance with this clause 5.4.  The relevant Limited Partner shall be responsible for all costs or expenses associated with the General Partner (or its nominee) holding and/or disposing of such securities.  Neither the General Partner nor the Investment Manager shall have any liability whatsoever, to the fullest extent permitted by applicable law, to any Limited Partner requesting the sale on their behalf of securities

KLUGMAN00061685

otherwise distributable to such Limited Partner in specie in connection with such sale or attempted sale.

5.4.4    The provisions of this clause 5.4 apply to distributions in specie during the life of the Partnership and shall be without prejudice to the provisions of clause 12.3 (*Liquidation*).

## 5.5    Tax Deductions

If the Partnership suffers a Tax Deduction on the amount of a payment or distribution of cash or other property to the Partnership or if the Partnership makes a Tax Deduction on any amounts allocated or distributed to one or more Partners, all payments by the Partnership in satisfaction of such Tax Deduction and all reductions in the amount of a payment or distribution that the Partnership would otherwise have received shall be treated as having been distributed to those Partners to which the related Tax Deduction is attributable.

# 6    PARTNERSHIP ACCOUNTS, TAX INFORMATION AND REPORTS

## 6.1    Annual Accounts

The General Partner shall prepare, or procure the preparation of, annual accounts of the Partnership for each Accounting Period in accordance with generally accepted accounting principles as modified with the agreement of the Auditors from time to time including a balance sheet, profit and loss account, statement of changes in Limited Partners' capital for such period. The General Partner shall cause such accounts to be audited by the Auditors. A copy of the audited accounts including the report of the Auditors and a statement of accounting policies shall be despatched to each Partner within a reasonable period following sign off by the Auditors.

## 6.2    Reports

6.2.1    In addition to clause 6.1 (*Annual Accounts*), the General Partner shall prepare semi annually, for the Valuation Days of 30 June and 31st December and as soon as practicable thereafter shall send to each Limited Partner or procure the preparation and despatch of an unaudited report comprising the Net Asset Value as calculated by the Administrator for such dates.

6.2.2    To the extent to which costs and valuations are stated in a currency other than Euro, then the General Partner will convert such costs and valuations into Euro for each report prepared pursuant to this clause 6. Each annual account or semi annual report prepared pursuant to this clause 6 shall be in English.

## 6.3    Partner's Accounts

6.3.1    Each Partner shall have, inter alia, a capital contribution account, a loan account (if applicable), and an income account and a capital gains/losses account which will be operated as follows:

(a)    the Capital Contribution of each Partner shall be credited to such Partner's capital contribution account; and

(b)    the amounts of Loan advanced by each Partner shall be credited to such Partner's loan account and repayments of its Outstanding Loan pursuant to clause 5.1 (*Application of Proceeds*) or otherwise pursuant to this Agreement shall be debited to such account; and

(c)    the proportion of all Net Income, allocated to each Partner pursuant to 4 (*Allocations of Profits and Losses*) shall be credited or debited, as the case may be, to that Partner's income account or capital gains/losses account and distributions to each Partner pursuant to clause 5 (*Distributions of Proceeds*) shall be debited to that Partner's income account or capital gains/losses account.

13

KLUGMAN00061686

### 6.4    Variation of Accounts

The General Partner may, with the approval of the Auditors, vary the accounting structure of the Partnership and may determine or vary the allocation of any item to reflect properly the intention of the Partners as stated in this Agreement provided that no such variation shall affect the distributions payable to Partners pursuant to clause 5 (*Distributions of Proceeds*).

### 6.5    Tax Information

The General Partner shall, upon the reasonable request and at the cost of any Limited Partner, promptly furnish to such Limited Partner any information in its possession as is reasonably necessary in order for such Limited Partner to claim any exemptions or reductions in or refund of withholding or other Taxes or to comply with its own tax return or report obligations in connection with its investment in the Partnership, or, if such Limited Partner is itself a Partnership, to assist its partners in complying with the same.

## 7    OPERATION AND MANAGEMENT OF THE PARTNERSHIP

### 7.1    General Operation of the Partnership

7.1.1    The General Partner shall subject to the provisions of clause 7.2 (*Authority and Powers of the General Partner*):

(a)    have exclusive responsibility for the operation of the Partnership and the management and control of its business and affairs,

(b)    have full power and authority, on behalf of the Partnership and with the power to bind the Partnership thereby, to do all other things and acts necessary to carry out the purposes of the Partnership or as is required of it by this Agreement;

(c)    devote as much of its time and attention thereto as shall be required for the proper management of the business of the Partnership and shall carry on and manage the same with the assistance from time to time of agents, advisers or other employees of the General Partner as it shall deem necessary;

(d)    do all things and discharge all duties or requirements required of or imposed on a general partner by the Act (whether or not on behalf of the Partnership) and where it is to do so for the Partnership it is hereby expressly authorised and shall have full power and authority to do so accordingly;

and shall use its best efforts, judgment and due care in carrying out its duties under this Agreement.

### 7.2    Authority and Powers of the General Partner

7.2.1    The General Partner or its agents or delegates shall have full power and authority (exercisable in its absolute discretion), on behalf of the Partnership and so as to bind the Partnership thereby and without prior consultation with any of the Limited Partners:

(a)    to appoint an Investment Manager to trade equities and equity derivatives in accordance with the Investment Policy at Schedule 2 and to perform any other functions listed below delegated to it by the General Partner from time to time;

(b)    to enter into agreements or deeds or execute agreements or deeds on behalf of the Partnership accordingly (in each case whether personally or through an attorney or other agent) and, where appropriate, to give warranties and indemnities in connection with any such acquisition, sale, exchange or other disposal or monetisation;

KLUGMAN00061687

(c)    to enter into, or require the Partnership to enter into, forward exchange contracts, to invest in currency or currency futures or currency options or contracts for differences or other instruments with a view to hedging trading positions or income receipts therefrom (but so that, for the avoidance of doubt, no omission to hedge or otherwise enter into arrangements to cover the risk of losses as a result of exchange or interest rate movements shall constitute a breach of any fiduciary or other duty of the General Partner);

(d)    to provide or procure the provision of office facilities and office and executive staff and office equipment to facilitate the carrying on of the business of the Partnership;

(e)    to accept applications by and require the Partnership to admit Limited Partners or Additional Limited Partners and to process redemptions;

(f)    to enter into, make and perform deeds, powers of attorney, contracts, agreements and other undertakings, and to give guarantees or indemnities in connection with Assets or proposed Assets.

(g)    subject to the limitations set out in Schedule 2 (*Investment Policy*), to receive money pursuant to any Financing Facility or to effect longer term hedging of non-Euro Assets for any of the purposes of the Partnership, and as determined by the General Partner and in connection therewith to make, issue, accept, endorse and execute promissory notes, drafts, bills of exchange, guarantees and other instruments and evidences of indebtedness, and to secure the payment thereof by mortgage, charge, pledge or assignment of or security interest in all or any part of the Partnership Assets;

(h)    to commence, conduct, settle or defend litigation that pertains to the Partnership or to any of the Partnership Assets;

(i)    to maintain records and books of account of and in the name of the Partnership at the Partnership's or its own principal place of business or at the principal place of business of any Associate of the General Partner, and to allow any Partner and its representatives reasonable access thereto at any reasonable time, subject to such Partner giving reasonable notice, for the purpose of inspecting the same;

(j)    to open accounts with banks, and or prime brokers or other brokers for and in the name of the Partnership, maintain such accounts, give payment and other instructions (including instructions in respect of any payments referred to below in this clause 7.2.1) to banks in respect of such accounts and receive, and pay into such accounts Capital Contributions and Loan contributions advanced by Partners, income or other sums arising from or on the disposal of and any other income of the Partnership, and any fees to which the Partnership is entitled;

(k)    to make distributions to the Partners in accordance with the terms of this Agreement;

(l)    to pay or direct the Partnership to pay:

     (i)    all amounts of Taxation for which the General Partner, any Associate or the Partnership is liable on behalf of any Partner (other than the General Partner) or the Partnership; or

     (ii)    any amount of Taxation in respect of which any Partner or the Partnership has been assessed in the name of the General Partner any Associate of the General Partner or the Partnership provided that if such assessment relates to a Partner then the General Partner shall first give notice to such Partner of such liability to

KLUGMAN00061688

Taxation and shall use its reasonable endeavours at the expense of such Partner to ensure that the amount assessed is in fact due;

(m)    to grant and make payments in respect of indemnities in accordance with clause 13.2 (*Indemnity*);

(n)    to pay all of the fees, costs, charges and expenses, Taxes and other items referred to in clause 8 (*Expenses and Fees*) to the extent specified therein and to provide against present or future contemplated obligations and contingencies;

(o)    to furnish reports and valuations to the Partners in accordance with the provisions of clause 6 (*Partnership Accounts, Tax Information and Reports*);

(p)    to accept the retirement of a Limited Partner, admit Additional or Substitute Limited Partners to the Partnership;

(q)    to engage employees, independent agents, administrators, lawyers, accountants, custodians, paying and collecting agents and financial and other advisers and consultants as it may deem necessary or advisable in relation to the affairs of the Partnership including, without limitation, any Associate of the General Partner (provided that any such engagement of an Associate shall be on arm's length terms) to perform or assist in the performance of all or any of the activities set forth in this clause 7.2;

(r)    to appoint a custodian or custodians of the Partnership Assets which for the avoidance of doubt may be the General Partner or an Associate of the General Partner (and to give settlement and other instructions to any custodian of the Partnership Assets);

(s)    to register and publish all such notices, statements or other instruments as may be required pursuant to the Act to be registered and published in relation to the establishment of the Partnership and in relation to any changes occurring in relation to the Partnership (to the extent the General Partner becomes aware of any such changes);

(t)    pending the application of monies subscribed pursuant to this Agreement in meeting liabilities of the Partnership and pending distribution pursuant to the terms of this Agreement, to place amounts drawn down or realised (as the case may be) in such deposit accounts in the name of the Partnership or a custodian or to invest the said amounts in such short-term instruments as the General Partner may determine;

(u)    generally to communicate with the Partners and to report to the Partners at such times as it shall think fit;

(v)    to do all or any other acts as are required of the General Partner by this Agreement or as are necessary or desirable in the reasonable opinion of the General Partner in furtherance of the foregoing powers, for or as may be incidental to the conduct of the business of the Partnership and consistent with the terms of this Agreement.

7.2.2    In carrying out its duties under this Agreement, the General Partner shall at all times comply with the Investment Policy. The investment objective, approach and restrictions stipulated in the Investment Policy or the Private Placement Memorandum shall not be deemed to have been breached as a result of changes in the price or value of certain investments comprised in the portfolio of the Partnership brought about through market forces or movements in the market. If any such restrictions are exceeded as a result of such market forces or movements or otherwise are breached, and the General Partner has been notified by the Investment Manager in accordance with its investment management agreement with

KLUGMAN00061689

the Partnership, the General Partner shall notify the Limited Partners in writing as soon as practicable after receipt of such notification.

7.2.3      The General Partner hereby undertakes that it shall at all times duly and punctually pay and discharge its separate and private debts and engagements whether present or future incurred or assumed by it as principal and other than in its capacity as general partner of the Partnership and shall keep the Limited Partners and their personal representatives, estates and effects indemnified therefrom and from all liabilities, actions, proceedings, costs, claims and demands in respect thereof.

## 7.3      Appointment of the Investment Manager

7.3.1      The General Partner shall appoint on behalf of the Partnership, by way of an Investment Management contract, the Investment Manager to conduct trading and investment activities on behalf of the General Partner or to enter into any transaction on behalf of or in any other way to bind the General Partner or the Partnership.

7.3.2      If the General Partner is removed pursuant to clause 7.4 (*Removal of the General Partner*) or otherwise withdraws as General Partner of the Partnership, then, unless the General Partner is replaced by an Associate or as otherwise agreed by the Limited Partners by Special Resolution, the appointment of the Investment Manager shall immediately terminate.

## 7.4      Removal of the General Partner

7.4.1      The Limited Partners shall have the right to terminate immediately the appointment of the General Partner without compensation for termination of its office within 120 days after Cause has occurred, such right being exercisable by the Limited Partners serving on the General Partner a written notice by all the Limited Partners who are not retired Limited Partners.

7.4.2      Upon the termination of the appointment of the General Partner in accordance with the provisions of this clause 7.4, the former General Partner shall deliver to any replacement General Partner, or as it shall direct, all Partnership Assets, and copies of all books of account, records, registers, correspondence and documents relating to the affairs of or belonging to the Partnership in the possession of or under the control of the former General Partner and take all necessary steps at the expense of the Partnership to vest in the Partnership or any replacement General Partner any Partnership Assets previously held in the name of or to the order of the Partnership or the former General Partner.

## 7.5      Restriction on the Limited Partners

The Limited Partners shall take no part in the operation of the Partnership or the management or conduct of its business and affairs, and shall have no right or authority to act for, transact the business of, sign or execute documents on behalf of or otherwise bind the Partnership or to take any part in or in any way to interfere in the conduct or management of the Partnership or to vote on matters relating to the Partnership other than as provided in the Act or as set forth in this Agreement, but they shall at all reasonable times, subject to having given reasonable notice, have access to and the right to inspect during normal business hours the books and records of the Partnership.

## 7.6      Exclusivity

7.6.1      The functions and duties which the General Partner and the Investment Manager and their respective Associates undertake on behalf of the Partnership shall not be exclusive and the General Partner, the Investment Manager and any of their respective Associates, or advisers may perform similar functions and duties for others and, without limitation, may act as a general partner, manager or investment

KLUGMAN00061690

adviser in or of any other fund or engage in any other activity and retain any benefit received for so doing, notwithstanding that the existence of such fund could affect adversely the size of the investments purchased or sold by the Partnership, provided, however, that the General Partner shall:

(a)  continue properly to manage the affairs of the Partnership;

(b)  where a particular transaction would be appropriate for the Partnership as well as one or more other funds, apportion such investment on a basis which the General Partner determines to be fair and equitable taking into account differing investment objectives, diversification considerations and the requirements and terms of the relevant documents and similar apportionment principles will apply, as necessary, in dispositions of an investment held by the Partnership and one or more other funds; and

(c)  to the extent expenses are incurred from time to time on behalf of the Partnership and any other fund, allocate such expenses on a basis the General Partner considers to be equitable.

### 7.7    Co-operation of the Limited Partners

Each Limited Partner shall execute such further documents and perform and do such further acts and things as the General Partner may reasonably request to carry this Agreement into full effect including but not limited to using best endeavours to make a timely and expedient claim, or procure that any third party makes a timely and expedient claim on its behalf to any relevant tax authority for any Reclaim Amount. Limited Partners will copy any correspondence, between them and any tax authority or other person with whom they are negotiating a Reclaim Amount, to the General Partner as soon as reasonably practicable.

## 8    EXPENSES AND FEES

### 8.1    Establishment Expenses

The Partnership shall be responsible for all of the preliminary costs and expenses incurred in relation to or in connection with the establishment of the Partnership, the marketing and offering of the Partnership interests and the establishment, organisation and creation of the operational structure of the Partnership, including but not limited to travel, legal, accounting, printing, postage, consultants' fees, reasonable and attributable out-of-pocket expenses of placement agents, brokers and intermediaries and other costs of establishment.

### 8.2    Operating Expenses

8.2.1    The Partnership shall be responsible for all operating and administrative costs, charges and expenses properly attributable to the Partnership's activities, including without limitation:

(a)  all costs, charges and expenses incurred by the Partnership or by the General Partner incurred directly or indirectly in connection with the Partnership, and in this respect the General Partner shall be entitled to recharge to the Partnership any such expenses incurred by it;

(b)  all interest and other expenses related to a specific acquisition, financing, refinancing, hedging, disposal (to the extent they are not capitalised as part of the cost of acquisition) any Financing Facility, and all legal, accounting and brokerage fees and expenses and registration fees and expenses;

(c)  the costs, fees and expenses of all legal, financial or other professional advisers and all independent consultants retained to advise the General Partner or the Investment Manager in respect of the Partnership;

18

(d)  all out-of-pocket costs and expenses incurred in relation to the acquisition, ownership and disposal of Partnership Assets (including extraordinary expenses, such as litigation or the cost of enforcing rights, if any) and the exercise by the General Partner or the Investment Manager of any and all voting, conversion or other rights attaching to Partnership Assets;

(e)  the fees and expenses of the Auditors in the preparation of the annual audit of the Partnership and/or all costs and out-of-pocket expenses incurred by any person in the preparation of Forms K-1s (or, if the Partnership is not required to file a United States federal income tax return for such taxable year, the equivalent thereof), financial statements and tax returns and the payment of any taxes due from the Partnership;

(f)  the expenses of all meetings of the Partners;

(g)  fees and expenses incurred on behalf of the Partnership in relation to the interpretation of this Agreement;

(h)  all expenses of any proceedings, litigation or arbitration (including fees of lawyers engaged to act in relation to any such proceedings, litigation or arbitration or the cost arising from enforcing any rights arising therefrom) by or against the Partnership, the amount of any settlements paid in connection therewith and all legal fees incurred for the purposes of the Partnership;

(i)  all Taxes and any statutory fees, if any, levied against or in respect of the Partnership (but not including the Taxes related to income or profit or distributions made to the General Partner, or the Limited Partners which shall be dealt with as provided in clause 7.2 (*Authority and Powers of the General Partner*));

(j)  expenses associated with the preparation, printing and distribution of reports to the Partners;

(k)  the amount of any expenses incurred in relation to any indemnity given in relation to the Partnership or any insurance premiums payable in respect of the Partnership;

(l)  all fees and expenses incurred in relation to any broker or to any custodian or nominee of Partnership Assets;

(m)  all fees and expenses incurred in relation to any fund administrator appointed by the Partnership, including those associated with the preparation of the Partnership's financial statements, Tax returns and the payment of any Taxes due from the Partnership;

(n)  all fees and expenses incurred in relation to any valuer appointed to value the Partnership Assets.

8.3  **Reimbursement of Expenses**

To the extent that the General Partner or the Investment Manager pays any establishment expenses, operating expenses or other expenses that are the responsibility of the Partnership pursuant to the terms of this Agreement, the Partnership shall reimburse the General Partner or the Investment Manager, as the case may be, for their respective shares of any such expenses.

9  **DEBTS AND LIABILITIES OF THE PARTNERSHIP**

If at any time the liabilities of the Partnership  (other than the Loans advanced by Limited Partners) cannot be satisfied out of the Partnership's cash funds (including the amount of any advances made pursuant to any Financing Facility) and the General Partner is required by law or otherwise obliged to make any payment in respect of such liabilities, the amount of any such payment made by the General Partner shall subsequently be repayable to the General Partner,

KLUGMAN00061692

together with interest thereon at 1% per annum above EURIBOR if and when cash funds become available to the Partnership.

## 10    TRANSFERS OF PARTNERSHIP INTERESTS

### 10.1    Transfer by the General Partner

The General Partner shall not sell, assign, transfer, exchange, pledge, encumber or otherwise dispose (including granting of any participation) ("**Transfer**") all or any part of its rights and obligations as a general partner nor voluntarily withdraw as the general partner of the Partnership without the approval of the Limited Partners by Special Resolution save that it may Transfer its rights and obligations to an Associate of the Investment Manager or the General Partner (whereupon, in the case of an assignment or transfer, such Associate shall become the general partner in place of the transferor).

### 10.2    Transfer by Limited Partners

10.2.1    No Transfer of all or any part of any Limited Partner's Partnership Interest, whether direct or indirect, voluntary or involuntary (including, without limitation, to an Associate or by operation of law), shall be valid or effective except a Transfer to a Permitted Transferee made with the prior written consent of both the General Partner and subject to the General Partner obtaining the prior written consent of all the other Limited Partners in the Partnership who are not a retired Limited Partner. Such consent is not to be unreasonably withheld or delayed.

10.2.2    No attempted Transfer shall be recognised by the Partnership and any such Transfer shall be void unless effected in accordance with and as permitted by this Agreement.

### 10.3    Position of Substitute Limited Partner

10.3.1    Each Substitute Limited Partner shall be bound by all the provisions of this Agreement and, as a condition of registering any Transfer or giving its consent to any Transfer to be made in accordance with the provisions of this clause 10 (*Transfers of Partnership Interests*), the General Partner shall require (and the transferring Limited Partner shall take all necessary steps to ensure) that the proposed Substitute Limited Partner acknowledges its assumption (in whole or, if the substitution is in respect of part only, in the proportionate part) of the obligations of the transferring Limited Partner by agreeing to be bound by all the provisions of this Agreement and becoming a Partner and undertakes to indemnify the Partnership, the General Partner and the Investment Manager in respect of any legal costs, taxes and expenses associated with such Transfer.

10.3.2    The Substitute Limited Partner shall not become a Partner and none of the Partnership, the General Partner or the Investment Manager shall incur any liability for allocations and distributions made in good faith to the transferring Limited Partner until the written instrument of transfer has been received by the Partnership and recorded in its books and the effective date of the Transfer has passed.

10.3.3    Provided that the Substitute Limited Partner has acknowledged its assumption of the obligations of the transferring Limited Partner, the General Partner shall, on behalf of all of the Partners, be authorised to release any Limited Partner who is making a Transfer for any future obligation in respect of the Partnership Interest (in whole or, if the substitution is in respect of part only, in the proportionate part) which is the subject of such Transfer.

### 10.4    No Dissolution of Partnership

The Transfer of any Partnership Interest or any part thereof under clauses 10.1 (*Transfer by General Partner*) or 10.2 (*Transfer by Limited Partners*) or, the withdrawal of any Limited Partner shall not cause the dissolution of the Partnership, provided that at all times there shall be at least one Limited Partner.

KLUGMAN00061693

10.5    **Assignment of Interests in Violation of this Clause**

No transfer of a Partnership Interest in violation of this clause 10 (*Transfers of Partnership Interests*) shall be valid or effective, and the Partnership shall not recognise the same, for the purposes of making distributions of Proceeds or repayments of Outstanding Loan or otherwise with respect to Interests in the Partnership.

11    **MEETINGS OF THE PARTNERSHIP AND CONSENT MATTERS**

11.1    **Meetings**

After the Initial Subscription Closing Date, the General Partner shall convene annual meetings of the Partnership and may, whenever it thinks fit, convene other meetings of the Partnership. The General Partner shall give written notice of such meeting to each Partner at least 1 Business Day in advance. Any Limited Partner(s) whose Sharing Percentages in aggregate represent 25% or more may, by notice in writing together with an agenda, requisition the General Partner to call a meeting of the Partnership and the General Partner shall convene such a meeting for a date no later than 30 Business Days from the date of that notice. The accidental omission to give notice of a meeting to, or the non-receipt of a notice of a meeting by, any Partner shall not invalidate the proceedings at the meeting.

11.2    **Chairman**

A member or officer of the General Partner shall preside as chairman of every annual and other meeting of the Partnership or, if he is not present or is unwilling to act, the members of the General Partner shall elect one of their number to be chairman of the meeting.

11.3    **Voting**

11.3.1    Any Partner who requisitions a meeting in accordance with clause 11.1 (*Meetings*) may table a resolution at such meeting provided that such Limited Partner has notified the General Partner in writing of such resolution at least 5 Business Days prior to the date of the meeting at which such resolution is tabled.

11.4    **Consent Matters**

11.4.1    Notwithstanding the provisions of clause 11.3 (*Voting*), if a particular action would under the terms of this Agreement require approval by Ordinary Consent or Special Resolution such action shall not be validly approved unless:

(a)    in relation to matters requiring Ordinary Consent, Limited Partners whose consent or votes represent more than 50% of the aggregate Sharing Percentages in the Partnership have approved such matters in writing; and

(b)    in relation to matters requiring Special Resolution, Limited Partners whose consent or votes equal or exceed 75% of the aggregate Sharing Percentages in the Partnership have approved such matters in writing.

12    **TERMINATION AND LIQUIDATION**

12.1    **Termination**

12.1.1    The Partnership has perpetual succession and separate legal personality and so death, bankruptcy, insolvency, dissolution, liquidation or withdrawal of a Limited Partner shall not operate to terminate the Partnership and the estate or trustee in bankruptcy or receiver or liquidator of a deceased, bankrupt, insolvent or dissolved Limited Partner shall not have the right to withdraw the balances on such Limited Partner's partnership accounts or require repayment of such Limited Partner's Outstanding Loan otherwise than in accordance with this Agreement. No Limited Partner shall be entitled to dissolve the Partnership by notice.

12.1.2   Subject as provided in clause 12.2 (*Reconstitution of Partnership*) and clause 12.4 (*Extension of Life of the Partnership*), the Partnership shall terminate on the expiry of the seventh anniversary of the Initial Subscription Closing Date or shall terminate prior to such date within 60 Business Days of the happening of any of the following events without any further action on the part of the Partners:

(a)   the bankruptcy, insolvency, expulsion, dissolution, liquidation, removal or withdrawal of the General Partner; or

(b)   the agreement to such termination by the General Partner and the Limited Partners by Special Resolution.

## 12.2   Reconstitution of Partnership

If the Partnership would otherwise be terminated pursuant to clause 12.1.2 (a) (*Termination*), the Partnership shall be reconstituted and its business continued by the Limited Partners electing by Special Resolution to continue the Partnership and electing a new General Partner.

## 12.3   Liquidation

12.3.1   Save as provided in this Agreement, a Partner shall not have the right to the return of its Capital Contribution except upon the termination or liquidation of the Partnership.

12.3.2   The General Partner shall not be personally liable to any other Partner for the return of its Capital Contributions or Outstanding Loans.

12.3.3   Upon termination of the Partnership (unless reconstituted under clause 12.4 (*Reconstitution of Partnership*), no further business shall be conducted except for such action as shall be necessary for the orderly winding-up of the affairs of the Partnership, the protection and realisation of the Partnership Assets and the distribution of the Partnership Assets amongst the Partners.  Subject to clause 7.1(*General Operation of the Partnership*), the General Partner shall act as liquidating trustee provided however that if the Partnership is terminated for a reason set forth in clause 12.1.2.(a)  (*Termination*), unless the Partnership is reconstituted pursuant to clause 12.2(*Reconstitution of Partnership*), the Limited Partners shall designate some other authorised person(s) to act as a liquidating trustee(s).  In either case the liquidating trustee or trustee(s) shall receive such remuneration for so acting as the Limited Partners shall agree by Ordinary Consent.

12.3.4   Upon termination of the Partnership, the liquidating trustee or trustees shall cause the Partnership to pay all debts, obligations and liabilities of the Partnership and all costs of liquidation and shall make adequate provision for any present or future contemplated obligations or contingencies in each case to the extent of the Partnership Assets.  The liquidating trustee(s) shall be authorised to sell any or all of the Partnership Assets on what it considers to be the best terms available or may, at its or their discretion provided that it or they have first used their reasonable endeavours to sell such Partnership Assets, and whether or not the same are subject to a Listing, distribute all or any of the Partnership Assets in specie at the Value reasonably determined by the General Partner.  The proceeds of the realisation of any Assets and other Partnership Assets and any assets distributed in specie shall be distributed amongst the Partners on the basis set out in clause 5 (*Distributions of Proceeds*) provided that there shall be retained from such distributions an amount equal to the Capital Contributions of all Partners and this amount shall be distributed to the Partners (pro rata to their respective Capital Contributions) at the end of the liquidation process in repayment of their Capital Contributions.  Partners receiving a distribution of Partnership Assets in specie shall be bound by the provisions of any agreements relating to such Partnership Assets, to the extent such agreements so provide.

12.3.5   Upon termination of the Partnership, no Partner shall, subject to clause 12.3.6, be liable to any other Partner for repayment of such other Partner's Outstanding Loan.

22

KLUGMAN00061695

12.3.6    A Partner who has an Outstanding Loan may bring a claim against the Partnership in debt for repayment of its Outstanding Loan if:

    (a)    repayment of its Outstanding Loan has become due in accordance with clause 5 (*Distributions of Proceeds*); and

    (b)    there has been a failure to make such repayment; and

    (c)    there are gross assets of the Partnership which should have been used in repayment of its Outstanding Loan in accordance with the provisions hereof which have not been so used,

but in such a case the liability of the Partnership to the Partner bringing such a claim shall be limited to the gross assets of the Partnership referred to in paragraph 12.3.6.(c) above.

## 12.4    Extension of Life of the Partnership

At any time prior to the seventh anniversary of the Initial Subscription Closing Date, at the discretion of the General Partner, the life of the Partnership may be extended for two additional one year periods.

# 13    EXCULPATIONS AND INDEMNITIES

## 13.1    Exclusion of Liability

None of the Indemnified Persons shall be liable for any loss to any Limited Partner or the Partnership for any action taken, or omitted to be taken, in good faith and in a manner reasonably believed to be in or not opposed to the interest of the Partnership and, with respect to any criminal action or proceeding, with no reasonable cause to believe that his or her conduct was unlawful, in each case save in respect of any loss resulting from a Breach of the Standard of Conduct by such Indemnified Person.

## 13.2    Indemnity

13.2.1    Subject to the U.S. Employee Retirement Income Security Act of 1974 as amended, and the U.S. Internal Revenue Code of 1986, as amended, in each case, as applicable, the Partnership agrees to indemnify and hold harmless out of Partnership Assets the Indemnified Persons against any and all liabilities, actions, proceedings, claims, costs, demands, damages and expenses (including legal fees) incurred, suffered or threatened arising out of or in connection with or relating to or resulting from:

    (a)    the Indemnified Person being or having acted as a general partner or manager or adviser or sub-adviser in respect of the Partnership;

    (b)    the exercise of its powers as a general partner or manager or adviser or sub-adviser; or

    (c)    the provision of services to or in respect of the Partnership or under or pursuant to this Agreement, any management agreement, advisory agreement, sub-advisory agreement or other agreement relating to the Partnership;

provided that any Indemnified Person shall not be so indemnified with respect to any liabilities, actions, proceedings, claims, costs, demands, damages or expenses resulting from a Breach of the Standard of Conduct by such Indemnified Person .

13.2.2    Notwithstanding any provisions of this Agreement to the contrary, an Indemnified Person may act upon the opinion or advice of or information obtained from legal advisers, bankers, accountants or other persons believed by the Indemnified Person in good faith and upon reasonable grounds to be an expert in relation to the matters

23

upon which he is consulted and to be independent of the Indemnified Person, and the Indemnified Person shall not be liable for any thing done or suffered by it or them in good faith reliance upon any such opinion, advice or opinion.

13.2.3     The Partners authorise the Partnership to advance expenses incurred by an Indemnified Person in defending any claim (other than a claim by a Limited Partner) prior to the final determination of such claim provided that such Indemnified Person agrees in writing to repay such amount to the Partnership if it is ultimately determined that such Indemnified Person is not entitled to be indemnified pursuant to this clause 13.2.

13.2.4     The General Partner shall promptly notify the Limited Partners of any material liability in respect of which the General Partner reasonably determines that indemnification by the Partnership pursuant to this clause 13.2 may be due provided that it is agreed and understood that failure by the General Partner to provide such notice shall not reduce the Partnership's obligation of indemnification hereunder.

## 13.3     Continuing Effect

For the avoidance of doubt, the indemnities under clause 13.2 (*Indemnity*) shall continue in effect, notwithstanding that the Indemnified Person shall have ceased to act as general partner/manager/adviser or otherwise to provide services to or in respect of the Partnership or to act in any of the capacities referred to in clause 13.2.1 (*Indemnity*).

## 13.4     Agents

No Indemnified Person shall be liable to any Limited Partner or to the Partnership for the negligence, dishonesty or bad faith of any agent (other than their respective Associates) acting for the General Partner, the Investment Manager or the Partnership provided that such agent was selected, engaged and retained by such Indemnified Person applying reasonable care.

## 13.5     Taxation

Each of the Limited Partners shall indemnify each of the General Partner, the Investment Manager and any Associate of either of them and the Partnership against the amount of Taxation for which the General Partner, the Investment Manager, such Associate or the Partnership is liable or assessed either on behalf of that Limited Partner or in respect of that Limited Partner's Partnership Interest. The General Partner shall notify such Limited Partner of any such amount having been paid.

## 13.6     Request by Limited Partner

The Limited Partners may, by Special Resolution, request that the General Partner or Partnership take action against any third party (including against any Indemnified Person) in respect of any breach of contract or tortious action or omission which has caused loss to the Partnership.

## 14     CONFIDENTIALITY

## 14.1     Confidential Information

The Limited Partners hereby acknowledge that the Partnership creates and will be in possession of confidential information the improper use or disclosure of which could have a material adverse effect upon the Partnership or upon one or more Partners of the Partnership. Likewise the General Partner and the Partnership may be in possession of sensitive and confidential information in respect of the Limited Partners, the improper use or disclosure of which could have a material adverse effect upon the Limited Partner in question. The Limited Partners hereby acknowledge that the rights of a Limited Partner to obtain information from the Partnership shall be limited to only those rights provided for in this Agreement and that, to the extent permitted by applicable law, any other rights provided by statute or regulation shall not

KLUGMAN00061697

be available to the Limited Partners.  Anything in this Agreement to the contrary, including without limitation any requirement to deliver audited or unaudited financial statements or to allow the inspection of the Partnership's books, any information provided or disclosed to a Limited Partner may be adjusted, at the General Partner's sole discretion, such that the actual names and other identifying data that relate to the Partnership's current, past or prospective Assets is not disclosed to the Limited Partners. The General Partner shall promptly notify the Limited Partners who have received adjusted information and give such Limited Partners a reasonable explanation as to the basis upon which the General Partner has decided to adjust such information.

14.1.1    The confidentiality requirements of this clause 14 shall not apply to a Limited Partner with regard to information that is or by such Limited Partner becomes publicly known or available in the absence of any improper or unlawful action.

14.1.2    The General Partner agrees not to release confidential information regarding the Limited Partners other than as required by law.

14.1.3    Each Limited Partner shall promptly notify the General Partner of any known unauthorised release or use of any confidential Partnership information.  The obligations and undertakings of each Limited Partner under this clause 14 shall be continuing and shall survive termination of the Partnership.

14.1.4    Each Limited Partner agrees not to employ the trading strategy or any derivation thereof of the Partnership for trading outside the Partnership on its own account.

14.1.5    The Partnership shall be entitled to enforce the obligations of each Limited Partner under this clause 14 to maintain the confidentiality of Partnership information provided by the Partnership or the General Partner to such Limited Partner.  The remedies provided for in this clause 14 are in addition to and not in limitation of any other right or remedy of the Partnership provided by law or equity, this Agreement, or any other agreement entered into by or among any one or more of the Partners and the Partnership or the General Partner. In the event of any legal proceedings relating to a breach of this clause 14 by a Limited Partner, such Limited Partner shall pay all costs and expenses incurred by the Partnership, including legal fees, if such Limited Partner is found to have breached its obligations hereunder.  Each Limited Partner hereby:

(a)    agrees that the remedy at law for damages resulting from its default under this clause 14 is inadequate because the substantial value that the Partnership derives from information concerning the Partnership requires that such information to be kept confidential; and

(b)    consents to the institution of an action for specific performance of its obligations or an injunction or other appropriate or equitable remedy to keep confidential the Partnership information.

Each Limited Partner further agrees that any actions taken by the Partnership under this clause 14 shall expressly supersede any duties the Investment Manager or General Partner may otherwise have to such breaching Limited Partner under this Agreement or otherwise.

## 15    VARIATION OF PARTNERSHIP AGREEMENT

### 15.1    Variation of Partnership Agreement with Consent

This Agreement may only be amended (whether in whole or in part) by Special Resolution with the written consent of the General Partner.

KLUGMAN00061698

16      **MISCELLANEOUS**

16.1    **Notices**

16.1.1    Notices which may or are required to be given hereunder by any party to another shall be in writing and sent by hand-delivery, facsimile or by e-mail to the relevant party at the physical address or e-mail address given in this Agreement or such other physical address or e-mail address as may from time to time be designated by any party hereto by notice to the General Partner (in the case of notice by the Limited Partners) and to each Limited Partner (in the case of notice by the General Partner). On request, a copy of any notice which is sent by e-mail should be sent on the day of sending the e-mail to either the physical address (by hand-delivery) or facsimile number of the relevant Partner. The first physical address, e-mail address and facsimile number for each Limited Partner shall be those specified in its Subscription Agreement. Notices by post (registered or not) will not be counted as adequately delivered.

16.1.2    Any notice will be deemed to be received:

(a)    on the day of receipt where any hand-delivered letter is delivered on a day before or during normal working hours;

(b)    on the first following Business Day, where any hand-delivered letter is delivered either on a Business Day after normal working hours or on any other day not being a Business Day;

(c)    on the day of transmission where any facsimile or e-mail is transmitted on a Business Day before or during normal working hours in the place of receipt; or

(d)    on the first following Business Day where any facsimile or e-mail is transmitted either on a Business Day after normal working hours or on any other day not being a Business Day.

16.2    **Auditors**

16.2.1    The General Partner shall appoint such firm of Auditors as it may in its discretion think fit to act as the Auditors to the Partnership.

16.2.2    The Auditors may resign from office or be removed at any time by the General Partner.

16.2.3    In the event of resignation or removal, the General Partner may invite the outgoing Auditors to send a written notice to each of the Limited Partners stating that there are no circumstances connected with their resignation or removal which they consider should be brought to the attention of the Limited Partners or a statement of any such circumstances.

16.3    **Non-recognition of Trust Arrangements**

The General Partner and the Investment Manager shall treat those Limited Partners registered as the Limited Partners of this Partnership under the Act as the Limited Partners of the Partnership under this Agreement and shall not (save as agreed otherwise herein) recognise any trust arrangement or other arrangement under which any such Limited Partner may hold its interest in the Partnership.

16.4    **Agreement Binding upon Successors and Assigns**

Except as herein otherwise specified, this Agreement shall be for the benefit of and shall be binding upon the heirs, executors, administrators or other representatives, successors and assigns of the respective parties hereto.

--

KLUGMAN00061699

### 16.5   Execution in Counterpart

This Agreement may be executed in any number of counterparts, each of which taken together shall be deemed to constitute one and the same agreement and each of which individually shall be deemed to be an original, with the same effect as if the signature on each counterpart were on the same original.

### 16.6   Governing Law

This Agreement and the rights, obligations and relationships of the parties hereto under this Agreement and in respect of the Private Placement Memorandum shall be governed by and construed in accordance with the laws of Gibraltar, and all the parties irrevocably agree that the courts of Gibraltar are to have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Agreement or the Private Placement Memorandum, whether or not governed by the laws of Gibraltar, and that accordingly any suit, action or proceedings arising out of or in connection with this Agreement or the Private Placement Memorandum or the acquisition of Partnership Interests shall be brought in such courts. The parties hereby waive, to the extent not prohibited by applicable law, and agree not to assert by way of motion, as a defence or otherwise, in any such proceeding, any claim that it is not subject personally to the jurisdiction of such courts, that any such proceeding brought in such courts is improper or that this Agreement or the Private Placement Memorandum, or the subject matter hereof or thereof, may not be enforced in or by such court.

### 16.7   No Right to Partition

Each Partner irrevocably waives during the term of the Partnership any and all rights to maintain an action (whether by law or equity) for partition with respect to any or all of the Partnership Assets.

### 16.8   Severability

If any clause or provision of this Agreement shall be held to be invalid or unlawful in any jurisdiction, such clause or provision shall only be ineffective to the extent of such invalidity or unenforceability. The remainder of this Agreement shall not be affected thereby and shall remain in full force and effect and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

### 16.9   Waiver

No failure to exercise and no delay in exercising on the part of any of the Partners any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies otherwise provided by law.

### 16.10   Deed

This Agreement is executed as a deed by the parties and is delivered and takes effect on the date set out at the beginning of this Agreement.

### 16.11   Conflict

In the event of any conflict between this Agreement and the Private Placement Memorandum, the terms of this Agreement shall prevail.

### 16.12   Previous Agreements

This Agreement supersedes and replaces the agreement dated 21 June 2012 between the General Partner and the Initial Limited Partner. The Partnership is continuous with the partnership established by the said agreement of 21 June 2012.

KLUGMAN00061700

16.13   **Entire Agreement**

This Agreement, and the Subscription Agreements entered into between individual Limited Partners, and the General Partner contain the entire agreement among the parties and supersede all prior arrangements or understanding with respect thereto.

**THIS DEED** has been executed and delivered as a deed on the date stated at the beginning of this Deed.

Executed as a Deed by Vale GP Limited

acting by a director and secretary

)
)
)

DIRECTOR

SECRETARY

Executed as a Deed by Duet Group Limited

acting by a director and secretary

)
)
)

28

KLUGMAN00061701

16.13  **Entire Agreement**

This Agreement, and the Subscription Agreements entered into between individual Limited Partners, and the General Partner contain the entire agreement among the parties and supersede all prior arrangements or understanding with respect thereto.

**THIS DEED** has been executed and delivered as a deed on the date stated at the beginning of this Deed.

Executed as a Deed by Vale GP Limited                    )
                                                          )
acting by a director and secretary                        )

Executed as a Deed by Duet Group Limited                  )

acting by a director and secretary

28

KLUGMAN00061702

## SCHEDULE 1

## ADDITIONAL LIMITED PARTNERS

| Name | Subscription Amount (€)/($) |
|------|------------------------------|
| Mill River Capital Management Pension Plan<br>40 West, 57th Street<br>New York, NY 10019 | $100,000 |

KLUGMAN00061703

## SCHEDULE 2

### INVESTMENT POLICY

**1.  Investment Objective**

The investment objective of the Partnership is to deliver attractive returns by entering into one or more equity and derivative strategies.

**2.  Investment Policies**

2.1. The Partnership will seek to achieve its investment objective through a policy of investment in equities and equity related instruments which are listed predominately in the major western European markets and some of the main non-European markets. The equity related instruments will predominately include listed instruments but may in some cases include unlisted securities.

2.2. The Investment Manager will seek to maintain an overall market neutral portfolio under which the Fund's investment returns are intended to be independent of overall movements in equity markets. To that end, the Partnership will enter into both long and short positions in order to mitigate exposure to overall market movements and to benefit from arbitrage opportunities that may exist.

2.3. The Investment strategy employed by the Investment Manager will require the Partnership to trade in a number of equity related instruments including shares, futures and other derivatives. The Partnership may also enter into securities lending agreements. The Partnership may invest in listed or unlisted, investment grade or non-investment grade debt securities, including, without limitation, profit participating notes, which are issued by entities independent of the Company and are designed to provide exposure to the asset classes or investments in which the Partnership is expected to invest. There is no limit to the investment in such profit participating notes.

2.4. The Partnership may invest in financial derivative positions, including listed options and listed futures of relatively short duration (generally less than one year and typically one week to three months) which may be physically or cash settled or closed out prior to their expiry date. Due to the margining process for listed derivatives, appropriate margin will be posted to the relevant exchange and a suitable cash position will be held in the Partnership to allow for daily marking of its positions.

2.5. The Partnership may also invest in obligations of EU and non-EU states, such as treasury bonds or in money market instruments such as commercial paper and certificates of deposit.

2.6. The Investment Manager intends to allocate risk among the Partnership's various investments in an attempt to maximise returns while diversifying the Partnership's overall portfolio. Forecasted correlations, liquidity and other considerations will influence risk allocation and may result in significant concentrations in certain positions for short periods of time.

**3.  Financing**

3.1. The Partnership could use a high amount of financing in order to maximise returns (each a "Financing Facility"). There is no limitation on the amount of financing which the Partnership may employ.

3.2. Where such financing is to be used, the Partnership expects to enter into financing arrangements with a bank, pursuant to which the Partnership will assign to the finance provider absolutely by way of first fixed security, subject to a provision for reassignment on redemption, all of its right, title, benefit and interest (but not obligations) in all of the assets of the Partnership held with the Prime Broker from time to time, as security for such financing. In the event of a default by the Partnership on its obligations under such finance arrangements,

the finance provider will be entitled to enforce its security interest over the assets of the Partnership and to take possession of, dispose of or set-off such assets against amounts owed to it by the Partnership.

KLUGMAN00061705



DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
PHILADELPHIA, PA  19255

CERTIFICATION
PROGRAM

Date: July 9, 2012



000235

Taxpayer: MILL RIVER CAPITAL MANAGEMENT PENSION PLAN
          TIN: 45-5322975
Tax Year: 2012

I certify that, to the best of our knowledge, the above-named entity is
a trust forming part of a pension, profit sharing, or stock bonus plan
qualified under section 401(a) of the U.S. Internal Revenue Code, which
is exempt from U.S. taxation under section 501(a), and is a resident of
the United States of America for purposes of U.S. taxation.

P. J. Bazick
Field Director, Accounts Management

Form 6166 (Rev. 6-2008)
Catalog Number 43134V

KLUGMAN00061706

# **TABLE OF CONTENTS**

Page

I.    NAME, PURPOSE AND DEFINITIONS ........................................................... 1

    A.    Name. ...................................................................................................... 1
    B.    Purpose. ................................................................................................. 1
    C.    Definitions. ............................................................................................. 1
    D.    Conflict with Plan. .................................................................................. 1
    E.    Co-Trustees. .......................................................................................... 1
    F.    Effective Date. ....................................................................................... 1

II.   ESTABLISHMENT OF TRUST ..................................................................... 2

    A.    Establishment. ....................................................................................... 2
    B.    Administration. ....................................................................................... 2
    C.    Contributions. ......................................................................................... 2
    D.    Return of Employer Contributions. ........................................................ 2
    E.    Transfers from Other Qualified Plans; Rollovers. ................................. 2
    F.    Transfer From Employer's Qualified Plans. .......................................... 3
    G.    Transfer To Eligible Retirement Plans. ................................................. 3
    H.    Deemed IRA Contributions. .................................................................. 3

III.  INVESTMENT OF TRUST ASSETS ............................................................ 3

    A.    Funding Policy. ...................................................................................... 3
    B.    Authority to Direct Investments. ............................................................ 3
    C.    Investments – Liability of Trustee. ........................................................ 4
    D.    Combination with Assets of Other Trusts. ............................................ 5
    E.    Qualifying Employer Securities or Real Property. ................................. 6

-i-

KLUGMAN00061707

|   |   |   |
|---|---|---|
| | F. | Participant Directed Accounts. ................................................................... 6 |
| | G. | Indicia of Ownership; Foreign Assets. ...................................................... 7 |
| | H. | Loans to Participants. ............................................................................... 7 |
| IV. | POWERS OF THE TRUSTEE. ................................................................................ 7 |
| | A. | General Powers. ......................................................................................... 7 |
| | B. | Multiple Trustees. ...................................................................................... 9 |
| V. | BOOKS AND RECORDS ......................................................................................... 9 |
| VI. | VALUATIONS AND ACCOUNTINGS ...................................................................... 10 |
| VII. | LIFE INSURANCE .................................................................................................. 10 |
| | A. | Application; Policy. ................................................................................... 10 |
| | B. | Exercise of Rights. ................................................................................... 10 |
| | C. | Premiums. ................................................................................................ 11 |
| | D. | Beneficiary Designation. .......................................................................... 11 |
| | E. | Liability of Insurance Company. ............................................................... 11 |
| VIII. | DISTRIBUTIONS .................................................................................................... 11 |
| | A. | In General. ............................................................................................... 11 |
| | B. | Payments Before Notice of Event. ........................................................... 11 |
| | C. | Payments to Missing Persons. ................................................................. 12 |
| | D. | Death of Participant. ................................................................................ 12 |
| | E. | Income Tax Withholding. .......................................................................... 12 |
| | F. | Distributions to Incompetent Persons. ..................................................... 12 |
| | G. | Qualified Domestic Relations Orders. ...................................................... 12 |
| IX. | RESIGNATION OR REMOVAL AND APPOINTMENT OF TRUSTEE ............ 12 |
| X. | TAXES, EXPENSES AND COMPENSATION OF THE TRUSTEE ................. 13 |

KLUGMAN00061708

|   |   |   |   |
|---|---|---|---|
| | A. | Taxes. ..................................................................................................... | 13 |
| | B. | Expenses; Compensation. ...................................................................... | 13 |
| XI. | | IRREVOCABILITY; AMENDMENT AND TERMINATION ................................ | 13 |
| XII. | | STANDARD OF CONDUCT OF FIDUCIARIES ............................................... | 13 |
| | A. | Fiduciaries. ............................................................................................ | 13 |
| | B. | Fiduciary Duties. .................................................................................... | 13 |
| XIII. | | MISCELLANEOUS ......................................................................................... | 15 |
| | A. | Request for Instructions. ....................................................................... | 15 |
| | B. | Liability of Trustee. ................................................................................ | 15 |
| | C. | Controversy. ........................................................................................... | 15 |
| | D. | Joinder of Parties. .................................................................................. | 15 |
| | E. | Spendthrift Provisions. ........................................................................... | 15 |
| | F. | Diversion of Assets Prohibited. ............................................................. | 15 |
| | G. | Gender and Number. .............................................................................. | 16 |
| | H. | Applicable Law; Severability. ................................................................. | 16 |
| | I. | Headings. ................................................................................................ | 16 |
| | J. | Inapplicability of Certain Provisions If Plan is Not an ERISA Plan......... | 16 |
| | K. | Successor Trustee(s)................................................................................ | 16 |

-iii-

KLUGMAN00061709

# Mill River Capital Management LLC Trust

This Trust Agreement (the "Trust" or "Agreement") is entered into by and between Mill River Capital Management LLC, a DE LLC, as "Employer", and Adam Larosa, as "Trustee." This Trust is intended to provide for the funding of the Plan which has been adopted by the Employer, and to accomplish this purpose, the Employer and the Trustee agree as follows:

## I.    NAME, PURPOSE AND DEFINITIONS

A.    Name.  The name of the Trust shall be Mill River Capital Management LLC Trust. The Mill River Capital Management Pension Plan (the "Plan") is incorporated as a part of this Agreement by this reference.

B.    Purpose.  This Trust is created for the purpose of receiving contributions made under the Plan, accumulating, managing and investing those contributions, and providing benefits to the Participants and their Beneficiaries. This Trust shall be administered for the exclusive purpose of providing benefits to the Participants and their Beneficiaries and defraying reasonable costs of administration. This Trust and the Plan are intended to satisfy all of the requirements for a qualified retirement plan under the appropriate provisions of the Internal Revenue Code, ERISA and other applicable federal and state laws.

C.    Definitions.  All specifically defined terms used in this Agreement shall have the meanings as defined in the Plan.

D.    Conflict with Plan.  If the provisions of this Agreement conflict with any of the provisions of the Plan, this Agreement shall control as it relates to the duties and obligations of the Trustee.

E.    Co-Trustees.  If there is more than one (1) Trustee, any one of such Co-Trustees shall have the right to make any decision, undertake any action or execute any documents affecting this Trust without the approval of the remaining Trustees. Any directions to any person or organization shall be executed by any one of the Co-Trustees. For purposes of this Trust and the Plan, "directions" shall mean any certification, notice, authorization, application or instruction of the Trustee.

F.    Effective Date.  This Trust Agreement shall be effective on the first day of the first Plan Year in which this plan is adopted by the Employer.

-1-

KLUGMAN00061710

II.    <u>ESTABLISHMENT OF TRUST</u>

A. Establishment.

This Agreement establishes a trust as to such funds as shall be from time to time deposited with the Trustee by or on behalf of the Employer or Participants pursuant to the Plan, together with income generated by such funds. The Trustee agrees to receive and hold such funds and income in trust in accordance with the terms of this Agreement. The Trustee shall not be individually liable to any person for any obligation or liability incurred on behalf of the Trust, and all persons shall look solely to the Trust assets for satisfaction of such obligations or liabilities.

B. Administration.

The Plan shall be administered by the Committee, and the Trustee shall have no duties with respect to the administration of the Plan. The Employer shall certify to the Trustee the names and signatures of the members of the Committee acting from time to time. The Committee shall comply with any reasonable requirements of the Trustee.

C. Contributions.

The Employer shall transmit to the Trustee all of its contributions and all contributions of the Participants. All contributions shall be in cash or if this is a profit sharing plan or stock bonus plan then contributions may be made by Employer stock or other property valued at fair market value and acceptable to the Trustee. The Trustee shall have no duty to determine or inquire whether any contributions to this Trust are in compliance with the Plan; nor shall the Trustee have any duty or authority to compute the amount of any such contributions; nor shall the Trustee be responsible for the collection or adequacy of any contributions to the Trust or for the adequacy of the Trust to meet and discharge liabilities under the Plan. Any premiums on life insurance policies owned by this Trust which are paid by the Employer directly to an insurance carrier shall be deemed to have passed through the Trust, even though not reflected on the books and records of the Trustee.

D. Return of Employer Contributions.

Except as specifically permitted under the terms of the Plan, the assets of the Plan and Trust shall never inure to the benefit of the Employer, and these assets shall be held for the exclusive purpose of providing benefits to Participants and their Beneficiaries and defraying reasonable expenses of administering the Plan and Trust.

E. Transfers from Other Qualified Plans; Rollovers.

If specifically permitted under the terms of the Plan, there may be transferred to the Trustee, subject to the approval of the Employer and Trustee, all or any of the assets held (whether by a trustee, custodian, or otherwise) on behalf of any other plan which satisfies the applicable requirements of Section 401(a) of the Code, or qualified rollover contributions, and which is maintained for the benefit of any persons who are or are about to become Participants. The Employer or Trustee may require a prior determination by the Internal Revenue Service that such transfer will not affect the qualified status of the Plan and Trust. Any such transfer of assets or Rollovers shall be held and administered in accordance with the provisions of the Plan relating to the administration of Employee and Rollover Contributions.

-2-

KLUGMAN00061711

F.  <u>Transfer From Employer's Qualified Plans</u>.

Upon direction of a Participant delivered to the Committee and the Trustee, the Trustee is authorized to receive the assets representing the value of any Participant's benefits earned under any other qualified plan maintained by the Employer. Upon receipt of such benefits, the Committee and the Trustee shall hold and maintain such benefits as a Rollover Contribution Account in connection with the relevant provisions of Article X of this Plan to be distributed in accordance with the provisions of Article VII of this Plan. Assets transferred and held in Rollover Contribution Accounts shall be deemed to be a part of the Participant's Accrued Benefit.

G.  <u>Transfer To Eligible Retirement Plans</u>.

Upon direction of the Participant delivered to the Committee and the Trustee of this Plan, the Trustee is hereby authorized to transfer the assets representing the vested Accrued Benefit of any Participant under this Plan to the Trustee of an Eligible Retirement Plan.

H.  <u>Deemed IRA Contributions</u>.  If permitted under the terms of the Plan, a Participant may be entitled to make Deemed IRA Contributions. The IRA Trustee shall be responsible for the administration of the Deemed IRA Contributions in accordance with the terms of the Plan.

III.    <u>INVESTMENT OF TRUST ASSETS</u>

A.  <u>Funding Policy</u>.  The Plan's funding policy and method, as determined from time to time by the Committee, shall be communicated to the fiduciary responsible for managing and investing the Trust assets (and each Investment Manager if selected in the manner set forth in Paragraph B1 or B2 below) in a timely manner so that the fiduciary (and each Investment Manager, if any) may coordinate the investment policies of this Trust with such funding policy and method. In investing and reinvesting the Trust assets, the fiduciary (and each Investment Manager, if any) shall have due regard for the Plan's funding policy and method, but in no event shall the fiduciary (or any such Investment Manager) have any responsibility for the establishment or adequacy of such funding policy and method.

B.  <u>Authority to Direct Investments</u>.  Except as provided in Paragraphs 1 and 2 below or in Paragraph F of this Article III, the Committee shall be the fiduciary responsible for directing the investment and management of the Trust assets.

1.  <u>Employer Appointment of Trustee or Investment Manager</u>.  The Employer may, by resolution of its Board, terminate the Committee's right to direct the investment and management of all or any portion of the Trust assets by transferring to the Trustee or an Investment Manager the authority and duty to direct the investment and management of all or any portion of the Trust assets.

2.  <u>Committee Appointment of Trustee or Investment Manager</u>.  As long as the Employer has not taken any action under Paragraph 1 above, the Committee

-3-

KLUGMAN00061712

may, but need not, appoint the Trustee or an Investment Manager to direct the investment and management of all or any portion of the Trust assets.

   3. Manner of Appointment, etc.. A certified copy of any Board resolution or resolution of appointment pursuant to Paragraphs 1 or 2 above shall be delivered to the Trustee, whereupon the Trustee or the Investment Manager, as the case may be, shall become the fiduciary with respect to the investment and management of such Trust assets. Any transfer of investment and management authority to the Trustee or to an Investment Manager shall be revoked upon receipt by the Trustee (and Investment Manager, if any) of a notice to that effect from the Employer through its Board or from the Committee, as the case may be. The appointment, selection, and retention of an Investment Manager shall be the sole responsibility of the Committee or the Employer, as the case may be. The Trustee is authorized to rely upon the fact that the Investment Manager is at all times a qualified Investment Manager (as defined in Section 3(38) of ERISA) until such time as the Trustee has received written notice from the Employer or Committee to the contrary. The Trustee is also authorized and entitled to rely upon the fact that the Investment Manager is authorized to direct the investment and management of the Trust assets until such time as the Employer or Committee, as the case may be, shall notify the Trustee in writing that another Investment Manager has been appointed in place of the Investment Manager named or, in the alternative, that the Investment Manager named has been removed and the responsibility for the investment and management of the Trust assets has been assumed by the Committee or has been transferred to the Trustee, as the case may be.

   C. Investments – Liability of Trustee.
During such period or periods of time, if any, as the Committee, an Investment Manager, or a Participant is authorized to direct the investment and management of the Trust assets, the Trustee shall (subject to the overriding limitations set forth below) effect and change investments of the Trust as directed in writing (or by telephonic or other electronic instruction if so authorized by the Committee) by Investment Manager, the Committee or Participant, as the case may be, and shall neither affect nor change any such investments without such direction and shall have no right, duty, or responsibility to recommend investment or investment changes. Such direction may be either general or specific in its terms and may be given on an "until revoked" basis. The following provisions shall govern the Trustee during such period or periods:

   1. Signature; Reliance on Directions. All written directions concerning investment and management made by the Committee, Investment Manager or Participant shall be signed by the authorized person or persons acting on behalf of the Committee or the Investment Manager, or by the Participant, as the case may be. The Trustee shall be entitled to rely upon such directions, as well as directions received by telephone or other electronic media if so authorized by the Committee, when purported to come from such authorized person or persons, or from the Participant.

   2. No Liability for Committee Actions. As long as the Committee possesses full power and responsibility to direct the Trustee with respect to the investment and management of all or any portion of the Trust assets, the Trustee shall not be liable or responsible in any way for any losses or other unfavorable results

-4-

KLUGMAN00061713

arising from the Trustee's compliance with the directions of the Committee which are made in accordance with the terms of the Trust and which are not contrary to the provisions of any applicable federal or state statute regulating such investment and management of the assets of an employee benefit trust.

3. No Liability for Investment Manager Actions. If an Investment Manager is given full authority and responsibility to direct the investment and management of all or a portion of the Trust assets, the Trustee shall not be liable or responsible in any way for any losses or other unfavorable results arising from the Trustee's compliance with the directions of the Investment Manager. In such event, to the extent Section 405(b)(3)(B) of ERISA so permits, the Committee shall also not be liable or responsible in any way for any losses or other unfavorable results arising from the Trustee's compliance with the directions of the Investment Manager.

4. No Duties Other Than Compliance With Directions. The Trustee shall be neither under a duty to question any directions of the Committee, Investment Manager or Participant, nor to review any securities or other property constituting Trust assets with respect to which the Committee, Investment Manager or Participant has investment responsibility, nor to make any suggestions to the Committee, Investment Manager or Participant in connection with such assets. The Trustee shall not be liable, in any manner or for any reason, for the making or retention of any investment pursuant to such direction, nor shall the Trustee be liable for its failure to invest any or all of the Trust funds in the absence of such directions. The Trustee shall, as promptly as possible, comply with any directions given by the Committee, Investment Manager or Participant.

5. No Duty to Investigate. During such period or periods of time, if any, as the Committee, an Investment Manager or Participant is authorized to direct the Trustee, the Trustee shall have no obligation to determine the existence of any conversion, redemption, exchange, subscription, or other right relating to any securities purchased of which notice was given prior to the purchase of such securities; and it shall have no obligation to exercise any such right unless the Trustee is informed of the existence of the right and is instructed to exercise such right, in writing, by the Committee, the Investment Manager or Participant, as the case may be, within a reasonable time prior to the expiration of such right.

6. No ERISA Liability. The Trustee shall not be liable under Section 405(b) of ERISA for following any instructions of the Committee that are referred to in Section 403(a)(1) of ERISA.

7. No Impermissible Investments. Neither the Committee, any Investment Manager nor Participant shall direct the purchase, sale or retention of any Trust assets if such directions are not in compliance with the applicable provisions of the Code and ERISA and any regulations or rulings issued thereunder.

D. Combination with Assets of Other Trusts. The Trustee may combine the Trust assets for investment purposes with the assets of any other trusts established by the Employer pursuant to the provisions of any qualified employee benefit plan. In such

-5-

KLUGMAN00061714

event, the Trustee shall keep separate records of the amounts allocable to each such fund. The Trustee shall have full power and authority to transfer Trust assets to any bank, trust company or savings and loan association, including the Trustee or any of its affiliates, licensed to do business in the state in which the Sponsoring Employer maintains its principal place of business, as trustee of any investment fund or funds consisting exclusively of assets of pension and profit-sharing trusts. In such event, the instrument or instruments creating and governing such fund or funds shall become a part hereof as fully as if set forth at length herein. Trust assets invested in said fund or funds shall be held and administered by the trustee thereof strictly in accordance with the terms and under the powers granted in said instrument or instruments.

E. <u>Qualifying Employer Securities or Real Property</u>. Unless permitted under ERISA, the Trustee shall neither invest in any security issued by the Employer which is not a "Qualifying Employer Security," as defined in this Paragraph E, nor in any real property which is leased to the Employer which is not a "Qualifying Employer Real Property" as defined in this Paragraph E. Unless the Plan is a profit-sharing plan, stock bonus plan or employee stock ownership plan, no investment of any Trust assets shall at any time be made in any Qualifying Employer Security if by reason of such investment the aggregate fair market value of all Qualifying Employer Securities (and Qualifying Employer Real Property) held in the Trust immediately after such investment shall exceed 10% of the then fair market value of the Trust assets. A profit-sharing plan, stock bonus plan or employee stock ownership plan may invest all Trust assets in Qualifying Employer Real Property and Qualifying Employer Securities, unless limited by provisions of the Plan. A "Qualifying Employer Security" means stock of the Employer and any bond, debenture, note, certificate, or other evidence of indebtedness of the Employer which is a "marketable obligation" as defined in Section 407(e) of ERISA. "Qualifying Employer Real Property" means qualifying real property as defined in Section 407 of ERISA.

F. <u>Participant Directed Accounts</u>. If, pursuant to the provisions of the Plan relating to this Trust, the Participants are empowered to direct and manage the share of the Trust assets held in their Accounts, then the Trustee shall, upon written direction from the Committee, segregate assets representing the value of a Participant's Accounts under the Plan to allow the Participant to manage the investment of those assets attributable to his or her Accounts within the limitations set forth in the Plan. The Trustee shall have no obligation to invest or otherwise manage assets earmarked for a Participant's Accounts until written notice is received from the Committee terminating the Participant's power to direct the investment of his or her Accounts. Following the death of a Participant, any rights and obligations of a Participant with respect to his or her directed Accounts may be held and assumed by his or her Beneficiary to the extent permitted under the terms of the Plan.

1. <u>Participant Direction</u>. A Participant shall exercise his or her investment rights by directing the Trustee or its authorized representative, either directly or through an investment manager appointed by the Participant, to enter into investment transactions. The Trustee shall ensure that the Participant receives written confirmation of his or her investment directions, when so requested by the Participant. At all times, the Trustee shall hold title to all investments held in the Participant's segregated

-6-

KLUGMAN00061715

Accounts.  The Trustee shall have no duty to oversee the Participant's investments; provided, however, that the Participant shall be precluded from investing in collectibles as defined in Section 408(m) of the Code.  Neither the Trustee nor any other fiduciary shall be liable or responsible in any way for any losses or other unfavorable results arising from the Trustee's compliance with the Participant's directions with respect to the assets segregated in his or her Accounts.

2.  <u>Limitations on Participant Direction</u>.  The Trustee may decline to implement any investment direction that the Trustee determines does not comply with rules and procedures established by the Committee.  The Trustee may decline to implement any investment direction that the Trustee determines (if implemented):

(a) would result in a prohibited transaction;
(b) would jeopardize the Plan's tax qualified status;
(c) would not be in accordance with Plan documents;
(d) would generate unrelated business taxable income;
(e) could result in a loss exceeding the Participant's account balance; or
(f) would cause the indicia of ownership of plan assets to be outside the jurisdiction of the district courts of the United States, other than as permitted under ERISA Section 404(b) and its regulations.

G.  <u>Indicia of Ownership; Foreign Assets</u>.  Except as otherwise permitted by regulation, the Trustee shall not maintain the indicia of ownership of any Trust assets outside the jurisdiction of the District Courts of the United States.

H.  <u>Loans to Participants</u>.  If permitted under the terms of the Plan, the Committee shall direct the Trustee to make a loan or loans to a Participant, or a beneficiary of a Participant, in accordance with the provisions governing such loans in the Plan.

IV.    <u>POWERS OF THE TRUSTEE</u>

A.  <u>General Powers</u>.  Subject to the provisions of Article III of this Agreement and any other limitations contained in this Agreement, the Trustee shall have all the powers necessary to hold in trust and administer all Trust assets including, but not by way of limitation, the power:

1.  To invest and re-invest Trust assets and to purchase or acquire and retain for the account of the Trust such properties as people of prudence, discretion and intelligence purchase for their own account, in accordance with the standards set forth in Article XII of this Agreement.  The assets purchased, acquired and retained by the Trustee for investment may include, but not by way of limitation, every kind of property, real, personal and mixed and interests therein, specifically including, but not by way of limitation, government obligations, corporate obligations of every kind, preferred and common stocks (including the stock of a corporate Trustee), buy and sell call and put options, and limited partnership interests, all in a manner conforming with the then existing law.

-7-

KLUGMAN00061716

2. In making such investments, the Trustee shall take into consideration any income tax effects resulting from investments yielding unrelated business taxable income.

3. To lease Trust assets for terms within or beyond the term of the Trust, for any purpose, including exploration for and removal of gas, oil and other minerals; and to enter into community oil leases, pooling and unitization agreements.

4. To abandon any real or personal property which the Trustee shall deem to be worthless or not of sufficient value to warrant keeping or protecting; to abstain from the payment of taxes, water rents, assessments, and the expenses of repairs, maintenance and upkeep of any such property; to permit any such property to be lost by tax sale or other proceedings, or to convey any such property for a nominal consideration or without consideration.

5. To remove all or any part of the Trust assets and to transfer the place of administration of the Trust to any location outside of the state in which the Sponsoring Employer maintains its principal place of business, provided it is within the United States of America.

6. To collect and receive the income of the Trust and any and all money, securities and other property, or any kind or nature due, owning or belonging to the Trust.

7. To deposit, hold and invest, without liability for interest thereon, any monies in any bank, trust company, or savings and loan association, including the Trustee or any of its affiliates including, without limitation, through purchase of or investment in, savings accounts, checking accounts, certificates of deposit and bankers acceptances. Notwithstanding the foregoing, any such investment in or purchase through the Trustee or any of its affiliates shall bear a reasonable rate of interest during such time as the Trustee is the fiduciary for the investment and management of the Trust assets so invested.

8. To sell, exchange or otherwise dispose of any securities or other property at any time or times and on such terms and conditions as the Trustee may deem appropriate, and to contract or grant options for the purchase, exchange or other disposition thereof.

9. To exercise, respecting bonds, shares of stock and other securities, all of the rights, powers and privileges of an owner, including holding securities in its own name (or in the name of a nominee with or without disclosure of the Trust), voting, giving proxies, making payments of costs, assessments or other sums deemed by the Trustee as expedient for the protection of the Trust, exchanging securities, selling or exercising subscription rights, exercising conversion rights, consenting to, and participating in foreclosures, reorganizations, consolidations, mergers, liquidations, pooling agreements and voting trusts, and assenting to corporate sales, leases and encumbrances.

-8-

KLUGMAN00061717

10. To extend the time of payment of any obligation at any time owing to the Trust; to deposit any securities or other property with any protective, reorganization, or similar committee, to delegate discretionary powers to any such committee, and to pay and agree to pay a portion of the expenses and compensation of any such committee and any assessments levied with respect to any such securities or other property so deposited.

11. To borrow money and to issue promissory notes evidencing any such borrowings or advances and to secure the repayment of such borrowings by mortgage, deed of trust, or pledge of any securities or other property constituting trust assets; and to pay and discharge any indebtedness of the Trust or any lien or other charge against the Trust.

12. To enforce any mortgage, deed of trust, pledge or other security interest held to secure Trust loans, and to purchase at any sale thereunder any property subject to such encumbrances.

13. To sue or defend in connection with any and all securities or other property at any time received or held by or for the Trust, and all costs and attorney's fees in connection therewith shall be charged against the Trust.

14. To settle, compromise or submit to arbitration any claims, debts or damages due or owing to or from the Trust; to commence or defend legal proceedings for or against the Trust; and to represent the Trust in all proceedings in any court of law or equity or before any other body or tribunal.

15. To create reserves of cash or other assets of the Trust for the payment of expenses, or for distributions pursuant to the Plan, or for any other purposes in connection with this Agreement.

16. To employ agents, including without limitation, investment advisors, appraisers, attorneys (including counsel for the Employer) and accountants and to rely on advice given by them.

17. To loan Trust assets on reasonable terms and interest rates securing such loans with adequate security.

B. Multiple Trustees. Unless otherwise provided in the Plan, a power vested in two or more Trustees may only be exercised by their unanimous action.

## V.    BOOKS AND RECORDS

The Trustee shall keep accurate and detailed accounts of all investments, receipts and disbursements, and any other transactions engaged in on behalf of the Trust; and all accounts, books and records relating thereto shall be open to inspection at all reasonable times by the Committee or its designated representative.

-9-

KLUGMAN00061718

VI.    VALUATIONS AND ACCOUNTINGS

As soon as administratively feasible after the Valuation Date, within 60 days after the removal or resignation of any Trustee and whenever so requested in writing by the Committee, the Trustee shall value the Trust assets and shall file with the Committee a written accounting reflecting the fair market value of the assets and liabilities of the Trust and the receipts and disbursements of the Trust since the last statement filed with the Committee. If the Trustee, in making any such valuation, determines that the Trust consists, in whole or in part, of property not traded freely on a recognized market, or that information necessary to ascertain the fair market value of any Trust assets or liabilities is not readily available to the Trustee, the Trustee may request the Committee to instruct the Trustee as to such fair market value for all purposes under the Plan; and in such event, the fair market value determined by the Committee shall be binding and conclusive. If the Committee fails or refuses to instruct the Trustee as to such fair market value within a reasonable time after receipt of the Trustee's request, the Trustee shall take such action as it deems necessary or advisable to ascertain such fair market value, including the retention of such counsel and independent appraisers as it considers necessary; and in such event the fair market value determined by the Trustee shall be binding and conclusive. Except for the Trustee's negligence, willful misconduct or lack of good faith, upon the expiration of 90 days from the filing of such accounting, the Trustee shall be forever released and discharged from all liability and accountability to anyone with respect to the propriety of its acts or transactions as set forth in such accounting, unless written objection is filed with the Trustee within said 90 day period by any person interested in the Trust.

VII.    LIFE INSURANCE

As directed in writing by the Committee and subject to such direction, the Trustee shall have the following powers and duties with respect to any investments in life insurance and annuity contracts:

A. Application; Policy. The Trustee may apply for a policy or policies of life insurance and/or annuity to be issued on the life of any Participant in an amount to be determined by the Committee on a non-discriminatory basis; provided, that the aggregate of premiums with respect to each such Participant must comply with the provisions of the Plan relating to life insurance at any particular time. Any policy shall be of a form customarily used for employee benefit trusts, issued by any legal reserve life insurance company selected by the Committee and qualified to do business in the state in which the Sponsoring Employer maintains its principal place of business. Each such policy shall be a contract between the insurance company and the Trustee and shall be owned and held by the Trustee as an asset of the Trust.

B. Exercise of Rights The Trustee may exercise any rights and options provided by any such policy or permitted by the issuing insurance company with respect to such policy, including the right to change any provision which shall become operative upon the termination of employment of any Participant. When a Participant's employment is terminated by retirement, Total Disability, death or otherwise, the Trustee may convert such policy into an annuity contract or cash for the benefit of the Trust or shall, at the

-10-

KLUGMAN00061719

written direction of the Committee, assign and deliver the policy to the Participant or his or her Beneficiary.

C. Premiums. At the written direction of the Committee, the Trustee shall pay the premiums on any policy held in the Trust out of Trust assets. The Trustee shall apply dividends in reduction of premiums. Any dividends payable with respect to any policy as to which there shall be no further premiums due shall be paid in cash to the Trustee and added to the Trust.

D. Beneficiary Designation. At the written direction of the Committee and subject to the provisions of the Plan relating to life insurance, the Trust shall be designated as the beneficiary under any such policy.

E. Liability of Insurance Company. No insurance company which issues any policy as provided above shall be a party to this Agreement, or have any responsibility for the validity of this Trust. The liability of any such insurance company shall be only as provided in any policy which it may issue. Any insurance company shall be fully protected from all liability in accepting premium payments from the Trustee and in making payments to or on the direction of the Trustee, without liability as to the application of such payments. Such insurance company shall be fully protected in dealing with the Trustee as the sole owner of policies held under this Trust, and it shall not be liable in assuming that the Trust has not been amended or terminated until notice of any amendment or termination of the Trust has been received by the insurance company at its home office. No amendment of the Trust shall deprive the insurance company of any protection except as to policies issued by it after receipt at its home office of notice of the terms of such amendment. The insurance company shall be fully protected in dealing with the Trustee according to the latest notification received by it at its home office.

## VIII.   DISTRIBUTIONS

A. In General. The Trustee shall from time to time, at the written direction of the Committee, make a distribution from the Trust to such persons, in such manner (that is, in cash or in kind), in such amounts and for such purposes as may be specified in such directions. Any such directions shall be signed by a majority of the then members, or by any such person or persons as may be from time to time designated by the Committee acting by a majority of its members. The Trustee shall incur no liability for any distribution made by it pursuant to the direction of the Committee, and the Trustee shall be under no duty to inquire as to whether any distribution directed by the Committee is made pursuant to the provisions of the Plan. The Trustee may make any cash distribution by mailing its check for the amount of such distribution, and may make any in kind distribution by mailing such property, to the person to whom such distribution is to be made at the address furnished by the Committee, or if no such address shall have been furnished, to such person in care of the Employer at its principal office.

B. Payments Before Notice of Event. Until the Committee shall receive written notice of any birth, marriage, death, or any other event upon which the right to payments from this Trust may depend, the Committee shall incur no liability to persons

-11-

KLUGMAN00061720

whose interests may have been affected by the event for disbursements made in good faith.

C. Payments to Missing Persons. If the Trustee is unable to effect delivery of any distribution to the person or entity entitled to receive it, it shall so advise the Committee and the Committee shall determine the method of distribution or forfeiture of such benefit in accordance with the Plan provisions and shall so instruct the Trustee.

D. Death of Participant. Upon the death of a Participant, the Committee may, but need not, require the personal representative of the Participant's estate and/or the Beneficiary to furnish proof of death and such tax release forms as are deemed appropriate by the Committee prior to making any payment of death benefits.

E. Income Tax Withholding. Distributions to any Participant or his or her Beneficiary shall be subject to any applicable tax withholding rules, including without limitation those set forth in Section 3405 of the Code and the Treasury Regulations promulgated thereunder.

F. Distributions to Incompetent Persons. The Committee may direct the Trustee to distribute the benefits of any Participant pursuant to the instructions of any person named by such Participant in a durable power of attorney which, on its face, appears to be valid and enforceable, or a court-appointed legal guardian or conservator of such Participant.

G. Qualified Domestic Relations Orders. Notwithstanding anything to the contrary contained herein, the Committee may direct the Trustee to make distribution to a Participant's Spouse or former Spouse in accordance with a Qualified Domestic Relations Order and in accordance with the terms of the Plan.

## IX.    RESIGNATION OR REMOVAL AND APPOINTMENT OF TRUSTEE

Any Trustee may resign at any time upon the giving of 60 days' written notice to the Employer, and any Trustee may be removed by the Employer at any time upon the giving of 60 days' written notice to all Trustees. Such 60-day period may be reduced by mutual agreement between the Employer and Trustee. The resignation or removal shall become effective upon the expiration of such 60 day period or an earlier date agreed to by the Employer and Trustee and thereupon the Employer shall, if there was but a sole Trustee, or may, if there was before such resignation or removal at least two Trustees, appoint a successor Trustee or Trustees which may be a corporation, one or more individuals or a combination thereof. Upon failure of the Employer to appoint a successor Trustee by the effective date of the resignation or removal, the Board shall become successor Trustee until another successor is appointed. Any successor Trustee shall have the same rights, powers and duties as he would have had as an original Trustee. In addition to the foregoing, with the consent of the Trustee, the Employer may appoint a co-Trustee or co-Trustees.

-12-

X.    TAXES, EXPENSES AND COMPENSATION OF THE TRUSTEE

A. Taxes. The Trustee shall deduct from and charge against the Trust assets any taxes paid by it which may be imposed upon the Trust or the income of the Trust or which the Trustee is required to pay with respect to the interest of any person in the Trust, in which latter event the deduction and charges shall be against the Account or Accounts of such person.

B. Expenses; Compensation. The Trustee shall not receive any compensation, or other form of remuneration, for its services. The Trustee shall have the power to pay out of the Trust assets all reasonable expenses of administration including, without limitation, fees paid to accountants, actuaries, appraisers and attorneys.

XI.    IRREVOCABILITY; AMENDMENT AND TERMINATION

Except for such amendments that are permitted under this Article XI, the Trust created under this Agreement is irrevocable. However, the Employer may terminate this Trust at any time without the consent of the Trustee or any beneficiary, and the Trust may be amended at any time by written agreement of the Employer and the Trustee; provided, however, that except in accordance with the provisions of the Plan and this Trust, such termination or amendment may not (i) deprive any Participant, any former Participant or the joint annuitants of any such Participant, or their personal representatives or designated Beneficiaries, of any interest which has vested under the terms of the Plan, nor (ii) cause or permit any portion of the Trust assets to be diverted to purposes other than for the exclusive benefit of the Participants, the former Participants and their joint annuitants, or their personal representatives or Beneficiaries, and defraying reasonable administrative expenses, nor (iii) cause or permit any portion of the Trust assets to revert to or become the property of the Employer unless required under the terms of the Plan. Further, the Employer may at any time in its sole and absolute discretion discontinue making contributions to the Trust.

XII.    STANDARD OF CONDUCT OF FIDUCIARIES

A. Fiduciaries. Each member of the Board and of the Committee and any other person to whom any fiduciary responsibility with respect to the Plan or Trust is allocated or delegated shall discharge his or her duties and responsibilities with respect to the Plan and Trust in accordance with the standards set forth in Section 401(a)(1) of ERISA and Paragraph B of this Article XII.

B. Fiduciary Duties. Subject to Sections 403(c) and (d), 404(c), 4042, and 4044 of ERISA, a fiduciary shall discharge his or her duties with respect to the Plan solely in the interest of the Participants and Beneficiaries and:

1. For the exclusive purpose of:

-13-

KLUGMAN00061722

(a) Providing benefits to Participants and their Beneficiaries;

(b) Defraying reasonable expenses of administering the Plan;

2. With the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

3. By diversifying the investments of the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

4. In accordance with the documents and instruments governing the Plan insofar as such documents and instruments are consistent with the provisions of this title.

-14-

KLUGMAN00061723

## XIII.    MISCELLANEOUS

A.    Request for Instructions.  In addition to instructions relating to valuations, at any time the Trustee may, by written request, seek instructions from the Committee on any matter and may await the written instructions from the Committee without incurring any liability whatsoever.  The Trustee shall be fully protected and shall have no liability for acting in accordance with such instructions.  If at any time the Committee fails to give instructions to the Trustee, the Trustee may act, and shall be protected in acting without such instructions, in such manner as in its discretion seems appropriate and advisable under the circumstances for carrying out the purposes of this Trust.

B.    Liability of Trustee.  In addition to any other limitations on liability set forth in the Agreement, the Trustee shall not be liable for any losses which may be incurred with respect to the Trust, except to the extent that such losses shall have been caused by its negligence, bad faith or willful misconduct, and the Trustee shall be fully protected for actions taken or not taken pursuant to the provisions of this Agreement.

C.    Controversy.  If any controversy arises with respect to this Trust, the Trustee shall, subject to the provisions of ERISA or the Code, take action as directed by the Committee or, in the absence of such direction, as it deems advisable in that circumstance.

D.    Joinder of Parties.  In any action affecting this Trust, only the Trustee, the Committee, and the Employer shall be joined as parties, and no Participant or other persons having any interest in this Trust shall be entitled to any notice or service of process unless otherwise required by law.  Any judgment entered in such action shall be binding on all persons claiming under this Trust.  Nothing in this Agreement shall be construed as to deprive a Participant of the right to seek adjudication of his or her rights under ERISA.

E.    Spendthrift Provisions.    Except with respect to a Participant loan or a Qualified Domestic Relations Order, neither the Employer nor the Trustee shall recognize any transfer, mortgage, pledge, hypothecation, order or assignment by any Participant or Beneficiary of all or any part of his or her interest under the Trust.  Any attempt by a Participant or Beneficiary to assign, alienate, sell, transfer, pledge or encumber his or her benefits shall be void.  A Participant's or Beneficiary's interest shall not be subject in any manner to transfer by operation of law, and shall be exempt from the claims of his or her creditors or other claimants (including but not limited to, debts, contracts, liabilities or torts) from all orders, decrees, levies, garnishments and/or executions and other legal or equitable process or proceedings against such Participant or Beneficiary to the full extent which may be permitted by law.

F.    Diversion of Assets Prohibited.  Except as provided in Paragraphs C and D of Article II of this Agreement, no portion of the Trust assets shall revert to or become the property of the Employer or be diverted to purposes other than for the exclusive benefit of Participants, former Participants or their joint annuitants, or their personal representatives or Beneficiaries, and defraying reasonable administrative expenses.

-15-

KLUGMAN00061724

G.    Gender and Number.  As used in this Agreement, the masculine, feminine or neuter gender, the single or plural number, and the use of the collective shall each be deemed to include the others whenever the context so indicates.

H.    Applicable Law; Severability.  This Agreement shall be construed and enforced in accordance with ERISA and the Code, to the extent applicable, and otherwise in accordance with the laws of the state in which the Sponsoring Employer maintains its principal place of business.  If any provision of this Agreement is held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions; and this Agreement shall be construed and enforced as if such provision had not been included.

I.    Headings.  Headings used in this Agreement are inserted for convenience or reference only and any conflict between such headings and the provision of this Agreement shall be resolved in favor of the provisions.

J.    Inapplicability of Certain Provisions If Plan is Not an ERISA Plan.  Notwithstanding any other provision of the this Agreement, at such times that the Plan is not an "employee benefit plan," within the meaning of Section 3(3) of ERISA, or is not subject to Part 4 of Title I of ERISA, Paragraphs B,C, E, F and G of Article III, the entirety of Article XII, and any reference to ERISA in this Agreement shall be inapplicable, and the Trustee shall have the authority to direct the investment and management of Trust assets."

K. Successor Trustee(s).  If the trustee(s) of this trust is/are unable or refuse to serve for any reason whatsoever, then _____ is/are nominated to serve as successor trustee(s).    *[Please fill in the blank]*

This Agreement is entered into this 22 day of May 20 12.

Mill River Capital Management PLC

By: _____
        Adam Larosa

Trustee:

Adam Larosa

KLUGMAN00061725

Draft – 4 December 2012

Principal Amount: [        ]
Issue Date: [        ]

### REGISTERED
### SUBORDINATED NOTE
### HAMLYN LP

PAYMENT ON THE PRINCIPAL OF AND INTEREST ON THIS NOTE IS REQUIRED TO BE MADE DIRECTLY TO THE REGISTERED HOLDER HEREOF WITHOUT NOTATION HEREON.  IT CANNOT BE DETERMINED FROM THE FACE OF THIS NOTE WHETHER ALL OR ANY PART OF THE PRINCIPAL OF OR INTEREST ON THIS NOTE HAS BEEN PAID.

HAMLYN LP (the "Partnership"), a Gibraltar limited partnership, for value received, promises to pay to Michelle Investments LLC, a Delaware limited liability company, as the registered holder of this note (the "Holder") the Principal Amount set forth above in lawful money of the United States of America, together with (a) interest at 8% per annum (the "Interest Rate"), and (b) the Origination Fee (as defined below), all charges, amounts and other sums due and payable hereunder ((a) and (b) together, "Costs").  Interest on the Principal Amount shall accrue at the Interest Rate.  The Principal Amount of this note, together with all accrued but unpaid interest thereon, shall, subject to this note, be due and payable upon the first to occur of (i) five (5) business days after receiving written demand for repayment made by the Holder to the Partnership, and (ii) December 15, 2013 (the "Maturity Date").  Any demand by Holder pursuant to the preceding sentence may be made as to the whole Principal Amount, together with all accrued but unpaid interest thereon, or as to any part thereof and any interest with respect thereon.

As a condition to the execution of this note, and as additional consideration for Holder's agreement to loan the amounts hereunder a loan origination fee in the amount of [_____] (the "Origination Fee") shall be payable by the Partnership to the Holder in immediately available funds to an account designated by Holder on the earlier of (i) the Maturity Date, and (ii) the date that more than ninety percent (90%) of the Principal Amount hereunder is repaid by the Partnership.  The Origination Fee is in addition to all interest and other sums payable to Holder and is fully earned and not refundable.

Notwithstanding the foregoing, and for the avoidance of doubt, the Partnership's obligation to repay Holder the principal and Costs hereunder upon demand of Holder or upon the Maturity Date is subject to the provisions of the paragraph herein titled "Subordination."

Interest hereon shall be payable on the outstanding principal at the Interest Rate for each day from the Issue Date of this note until the date the Principal Amount of this note is paid in full.  The interest payment shall accrue and shall be paid in full upon the Maturity Date.  Notwithstanding the foregoing, the Maturity Date of this note may be extended from time to time by the mutual agreement in writing of the Partnership and the Holder on mutually agreeable extension terms.

60974277_1.DOCX

KLUGMAN00061726

Principal of and interest on this note shall be paid to the registered Holder hereof by electronic funds transfer by the Partnership pursuant to the instructions provided by the Holder that will be recorded in the note register maintained by the Partnership, without the necessity of surrendering or presenting this note, alternatively the parties may make provision for the payment of principal and interest by such other method as may be mutually agreed, and all such payments shall fully discharge the obligation of the Partnership hereunder to the extent made.

The Partnership may, without penalty, prepay the note at any time or from time to time, but in all events only up to ninety percent (90%) of the Principal Amount. Any such prepayment amount paid to the Holder shall be applied, first, to accrued but unpaid interest, and second, to the then outstanding principal amount.

This note shall be registered by the Partnership upon the initial delivery hereof, in the name of the initial Holder, by endorsement in the space provided at the end hereof and on the books to be kept for that purpose by the Partnership and, thereafter, this note shall be transferable only by successive endorsements by the Holder to successive registered Holders. Payment of this note and the interest hereon shall be made only to the registered Holder hereof on the date such payment is due. The Partnership may deem and treat the person in whose name this note is registered pursuant to endorsement as the absolute owner hereof for all purposes and the Partnership shall not be affected by any notice to the contrary.

Subordination: The rights of the Holder to the principal sum or any sum or part thereof, and the Costs, are and shall remain subject and subordinate to the prior payment of any and all other indebtedness (including the principal of and interest on any such indebtedness) constituting existing or future obligations of the Partnership for money borrowed from the Bank of Nova Scotia ("Scotia") as Prime Broker with respect to the transactions referenced below, and upon dissolution or liquidation of the Partnership no payment shall be due or payable upon this note until all of the obligations to Scotia have been paid in full. The Holder and Partnership hereby agree (i) to amend this section of the note if required to do so by Scotia, and (ii) to execute any and all documents necessary to accomplish such an amendment.

The right of the Holder to Costs or any sum or part thereof are and shall remain subject and subordinate to the prior payment of all other Permitted Expenses (as defined below).

Stipulations and Warranties: The Partnership hereby stipulates and warrants that the loan evidenced hereby is a commercial loan and that all of the proceeds of such loan will be used solely to provide collateral for and pay direct trading expenses related to certain transactions as a client of Scotia. The Partnership will at all times in good faith provide all necessary information to Scotia on a timely basis and otherwise assist in carrying out such transactions with Scotia, and to the extent Scotia should fail to carry out such transactions the Partnership shall immediately cease implementing any further transactions (although may take reasonable steps to wind up any pending transactions) until it has received the consent of the Holder.

The loan evidenced hereby will not be used to meet indemnification or other obligations of the Partnership under any contract to which the Partnership may be a party except in respect of meeting the direct trading expenses previously described or Permitted Expenses as defined below.

60974277_1.DOCX                              2

KLUGMAN00061727

As a condition to the execution of this note, and as additional consideration for Holder's agreement to loan the amounts hereunder, the Partnership hereby agrees that it will not incur any indebtedness, other than this loan and any indebtedness with Scotia further to the above referenced transactions or any Permitted Expenses, without Holder's prior express written consent. For purposes of the foregoing sentence, indebtedness includes, but is not limited to, any acceptance or reliance on any guarantees, collateral support or other similar arrangements with any third party and for any purpose, any extension of credit, any mortgages, security interests, liens or encumbrances, or any guaranty of another's indebtedness or obligations, but shall exclude the "Permitted Expenses" being expenses or liabilities properly incurred by the Partnership to its investment manager, administrator, auditor, legal advisors and any other advisors or service providers, provided however, that such exclusion in respect of Permitted Expenses other than investment management fees or amounts due Scotia shall not exceed EUR 195,000.

This note shall be binding upon and inure to the benefit of the Partnership and Holder and their respective successors and permitted assigns (in the case of Holder, permitted registered assigns), and shall not be assigned by the Partnership or Holder without the prior written consent of the other party. This note may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of such change or termination is sought. No waiver of any provision of this note, and no consent to any departure by the Partnership therefrom, shall be effective unless it is in writing and signed by Holder. The terms and provisions of this note are severable. In the event of the unenforceability or invalidity of any one or more of the terms, covenants, conditions or provisions of this note under applicable law, such unenforceability or invalidity shall not render any other term, covenant, condition or provision hereunder unenforceable or invalid.

By signing below, the Partnership hereby represents and warrants that it has full power, authority and legal right to execute and deliver this note and that the indebtedness evidenced hereby constitutes a valid and binding obligation of Partnership, which is due and payable in accordance with the terms hereof. Furthermore, the Partnership hereby (i) waives demand, presentment for payment, notice of nonpayment, notice of intent to accelerate, notice of acceleration, protest, notice of protest and all other notice (except notice specifically provided for herein), filing of suit and diligence in collecting this note, and (ii) agrees that Holder shall not be required first to institute suit or exhaust its remedies herein in order to enforce payment of this note. Furthermore, Vale GP Limited, on behalf of itself, shall not, by amendment of its articles of incorporation or through a reorganization, transfer of assets, consolidation, merger, dissolution, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed and performed under this note by the Partnership, but shall at all times in good faith assist in carrying out all the provisions of this note and in taking all such action as may be necessary or appropriate to protect Holder's rights under this note against impairment.

This note shall be governed by and shall be construed and enforced in accordance with the internal laws of the State of New York without regard to its conflicts of law doctrine.

IN WITNESS WHEREOF, this note is signed by the duly authorized officer of the General Partner of the Partnership as of the day and year first above written.

60974277_1.DOCX                                   3

KLUGMAN00061728

HAMLYN LP

By:  VALE GP LIMITED, its General
       Partner


By: _____(SEAL)
       Name:
       Title:


REGISTERED HOLDER:                ADDRESS:

MICHELLE INVESTMENTS LLC          c/o Kaye Scholer LLP
                                             425 Park Avenue
                                           New York, New York
                                           Attn:  Michael Ben-Jacob, Esq.

60974277_1.DOCX                    4

KLUGMAN00061729